# EXHIBIT A

**CT CORPORATION**
A WoltersKluwer Company

**Service of Process Transmittal**
09/10/2007
Log Number 512575513

TO:        Kathy Milo
           General Dynamics Corporation
           2941 Fairview Park Drive, Suite 100
           Falls Church, VA, 22042-4513

RE:        **Process Served in Georgia**

FOR:       General Dynamics SATCOM Technologies, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Datapath, Inc., Pltf. vs. General Dynamics Satcom Technologies, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Copy of Entry of Service, Summons, Complaint and Application, Verification, Exhibits |
| **COURT/AGENCY:** | Gwinnett County Superior Court, GA<br>Case # 07A-07908-2 |
| **NATURE OF ACTION:** | Breach of contract – Seeking interlocutory injunction enjoining Dft. from awarding purchase order or subcontract for Type 5 satellite terminals to any person other than Pltf. or manufacturing such terminals itself and providing them to the Government |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Atlanta, GA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/10/2007 at 12:10 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | George D. Wenick<br>Smith, Currie & Hancock LLP<br>2700 Marquis One Tower<br>245 Peachtree Center Avenue, N.E.<br>Atlanta, GA, 30303-1227<br>404-521-3900 |
| **ACTION ITEMS:** | Telephone, Kathy Milo , 703-876-3058<br>*Left voice mail message for Kathy Milo*<br>SOP Papers with Transmittal, via  Fed Ex Standard Overnight, 798760071532<br>Email Notification, Kathy Milo kmilo@generaldynamics.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Cindy Zidick |
| **ADDRESS:** | 1201 Peachtree Street,N.E.<br>Atlanta, GA, 30361 |
| **TELEPHONE:** | 404-965-3840 |

Page 1 of 1/LM

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.

**SHERIFF'S ENTRY OF SERVICE**

Civil Action No. 2007A-01903

Date Filed AUG 13 - 31 2007

SUPERIOR COURT
FULTON
GEORGIA, FULTON COUNTY

DATAPATH, INC.
Plaintiff

GENERAL DYNAMICS
SATCOM TECHNOLOGIES
INC.
Defendant

Attorney's Address
4011 JONES
1475 PEACHTREE CENTER AVE N.E. 2700
ATLANTA, GA 30303-1047

Name and Address of Party to be Served
GENERAL DYNAMICS SATCOM TECH. INC.
40 TECHNOLOGY CORPORATION SYSTEM REG AGENT
1201 PEACHTREE ST
ATLANTA, GA 30361 NE

**SHERIFF'S ENTRY OF SERVICE**

General Dynamics SatCom Tech. Inc.

Lynn Mac Donald

TIME 10:15  DATE Sept 11 2007

DEPUTY

SHERIFF DOCKET _____ PAGE _____

WHITE-CLERK CANARY-PLAINTIFF PINK-DEFENDANT

## IN THE SUPERIOR COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

Datapath, Inc.

_____

_____

PLAINTIFF

VS.

General Dynamics Satcom Technologies, Inc.

_____

_____

DEFENDANT

CIVIL ACTION NUMBER  07A-07908-2

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to file with the Clerk of said Court and serve upon the Plaintiff's attorney, whose name and address is:

George D. Wenick and Reginald M. Jones, Smith, Currie & Hancock LLP, 2700 Marquis One Tower, 245 Peachtree Center Avenue, N.E., Atlanta, Georgia, 30303-1227; phone 404-521-3800; fax 404-688-0671

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This __31__ day of _____August_____, 2007 .

Tom Lawler
Clerk of Superior Court

By:_____
Deputy Clerk

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

COCSC-1 Revised 12-99

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

2007 AUG 31  PM 4: 22

TOM LAWLER. CLERK

DATAPATH, INC.,            )
                           )
    Plaintiff,             )
                           )
v.                         )
                           )
GENERAL DYNAMICS SATCOM    )
TECHNOLOGIES, INC.,        )
                           )
    Defendant.             )
                           )

CIVIL ACTION

FILE NO. 07CV - 07908 - 2

## VERIFIED COMPLAINT AND
## APPLICATION FOR INJUNCTIVE RELIEF

COMES NOW Plaintiff DataPath, Inc. ("DataPath") and files this Verified

Complaint and Application for Injunctive Relief and Specific Performance against

Defendant General Dynamics SATCOM Technologies, Inc. ("General Dynamics"),

stating as follows:

### PARTIES

1.    Plaintiff DataPath is a corporation organized and existing under the laws

of the State of Georgia, having its principal place of business at 3095 Satellite

Boulevard, Suite 600, Duluth, Gwinnett County, Georgia 30096-0300.

2.    Defendant General Dynamics is a corporation organized and existing

under the laws of the State of Delaware, having a principal place of business at 4825

River Green Parkway, Duluth, Gwinnett County, Georgia 30096.

### JURISDICTION AND VENUE

3.    Subject matter and personal jurisdiction are proper in this Court.

4.     Venue is proper in this Court in accordance with O.C.G.A. § 9-10-30 and O.C.G.A. § 14-2-510.

## FACTUAL BACKGROUND

### The ID/IQ Contract Solicitation and the Parties' Teaming Agreement

5.     The United States Department of the Army, U.S. Army Communications-Electronics Command, ("Government") operates the World-Wide Satellite Systems program ("WWSS Program"), which provides satellite communications for the Department of Defense.

6.     Under the WWSS Program, the Government solicited proposals for an Indefinite Delivery/Indefinite Quantity contract ("ID/IQ Contract"), known as Contract No. W15P7T-06-D-L219, under which the Government intended to purchase six satellite terminal types.

7.     The Government intended to issue such ID/IQ Contracts to six contractors, who would then be eligible for a period of five years to submit proposals for individual Delivery Orders under such contracts. Purchases under all ID/IQ Contract were expected to total several billion dollars.

8.     The ID/IQ Contract solicitation required each proponent to submit information in their proposal concerning each of the six satellite terminal types that the Government expected to purchase and to demonstrate that they had the capability and experience necessary to deliver working solutions for all six types. Specifically, the solicitation stated  that the "Contractor must be capable of providing a turn-key solution for all terminal types that meet specific user requirements as delineated in each RTEP."

2

9.    DataPath had the capability and experience necessary to deliver working solutions for all six satellite types and submitted a proposal for the ID/IQ Contract, based on its equipment for all types.

10.    Through its wholly owned subsidiary, RSIMaryland, Inc., trading as VertexRSI ("VertexRSI"), General Dynamics wished to submit its own proposal for the ID/IQ Contract and, thereby, compete with DataPath.

11.    General Dynamics was unable to submit a proposal on its own, however. It lacked the capacity and experience necessary to prepare a proposal for and deliver Prime Mover/Trailer Mounted Satellite Terminals ("Type 5") and Deployable Satellite Earth Terminals ("Type 6"). Without a solution for Type 5 and Type 6 satellite terminals, General Dynamics could not satisfy the Government's requirements.

12.    The Government expressly authorized contractors that were unable to provide solutions for all six terminal types to team up with other companies to present a proposal that included all six satellite terminal types. Specifically, the Government advised prospective offerors, as follows:

> A prime offeror must provide a solution for ALL terminal types and associated hardware and software services in the PWS. You may partner with other companies so you are able to provide a solution for ALL terminal types and associated hardware and software services in the PWS

13.    To overcome its deficiencies concerning Type 5 and Type 6 satellite terminals, General Dynamics, acting through VertexRSI, entered into a written teaming agreement ("Teaming Agreement") with DataPath. A true and correct copy of the Teaming Agreement is attached as Exhibit A. A true and correct copy of a Reciprocal Proprietary Information Non-Disclosure Agreement, which was incorporated into the Teaming Agreement by express reference, is attached as Exhibit B.

14. The Teaming Agreement states that it "shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns." After execution of the Teaming Agreement, VertexRSI was dissolved and General Dynamics succeeded to its interests, including its interests in the Teaming Agreement with DataPath. Accordingly, General Dynamics became bound by such agreement.

15. The Teaming Agreement expressed a two-part bargain:

- First, DataPath agreed to provide General Dynamics with technical assistance in preparing General Dynamics's a proposal for the ID/IQ Contract based on DataPath's proven equipment for the Type 5 and Type 6 satellite terminals, including an accurate technical and price proposal.

- Second, in exchange for DataPath's assistance in preparing such proposal, General Dynamics agreed that, if General Dynamics were successful in obtaining one of the ID/IQ Contracts and any delivery orders under it, DataPath would be the exclusive supplier for all Type 5 and Type 6 satellite terminals. Specifically, the Teaming Agreement stated in the Statement of Work ("SOW") that "DataPath will be the exclusive provider of the complete terminals in accordance with the requirements stated in sample tasks 5 and 6 of the WWSS solicitation."

16. Under the Teaming Agreement, General Dynamics also agreed to disclose its relationship with DataPath to the Government and "include appropriate

4

recognition of [DataPath's] participation in and contributions to the Proposal and a recommendation of [DataPath] as the subcontractor for the portion of the prime contract assigned to [DataPath]. ..."

17.   The Teaming Agreement defined the terms of the subcontract that General Dynamics agreed to issue to DataPath, upon General Dynamics's receipt of a contract from the Government.  Specifically, the Teaming Agreement stated that such subcontract would make DataPath the exclusive provider of Type 5 and Type 6 satellite terminals and would include the following additional terms:

> (i) those terms and conditions in the prime contract that [General Dynamics] must include in the subcontract (ii) [General Dynamic's] standard terms and conditions for subcontracts except as modified by mutual agreement of the parties and (iii) other terms and conditions negotiated in good faith between the Parties.

18.   After reviewing the responsive proposals, on August 29, 2006, the Government awarded DataPath one of the ID/IQ Contracts.  The Government also awarded ID/IQ Contracts to General Dynamics and four other contractors.

### The Government's RTEP W15P7T-06-R-L406 (WINT 002)

19.   Pursuant to the ID/IQ Contracts, the Government issued a Request for Task Execution Plan ("RTEP") W15P7T-06-R-L406 (WINT 002), which solicited a proposal for a Delivery Order.  W15P7T-06-R-L406 (WINT 002) included Type 5 satellite terminals, as well as other terminal types.

20.   DataPath and General Dynamics submitted proposals for the RTEP W15P7T-06-R-L406 (WINT 002), and the Government awarded Delivery Order W15P7T-06-D-L219 under that RTEP to General Dynamics.

21.    The Government is likely to issue amendments to Delivery Order W15P7T-06-D-L219 that call for delivery of additional satellite terminals. The exact quantity of additional satellite terminals is unknown but could easily equal four times the number of satellite terminals delivered under the original RTEP.

22.    As required by the Teaming Agreement, on June 22, 2007, General Dynamics entered into a subcontract with DataPath, under which General Dynamics agreed to purchase from DataPath all Type 5 satellite terminals that General Dynamics was to supply to the Government under Delivery Order W15P7T-06-D-L219. The subcontract expressly included all Type 5 satellite terminals that may be required by any amendments to the Delivery Order W15P7T-06-D-L219.

23.    Specifically, the subcontract between General Dynamics and DataPath for Delivery Order W15P7T-06-D-L219 stated that "DataPath shall be the exclusive provider of the STT under W15P7T-06-D-L219, Delivery Order 0002 ['Support Wide Area Network (SWAN)'] or any amendment under Delivery Order 0002." A true and correct copy of the subcontract for RTEP W15P7T-06-D-L219 is attached hereto as Exhibit C.

### The Government's RTEP W15P7T-07-R-L435 (WINT 0014)

24.    Pursuant to the ID/IQ Contract, the Government issued RTEP W15P7T-07-R-L435 (WINT 0014), which solicited proposals for an additional Delivery Order. RTEP W15P7T-07-R-L435 (WINT 0014) included Type 5 satellite terminals.

25.    DataPath and General Dynamics submitted proposals for RTEP W15P7T-07-R-L435 (WINT 0014).

6

26.    As a result of working with DataPath and performing under the WWSS Program, General Dynamics has apparently developed the capacity and experience necessary to produce its own Type 5 satellite terminals, without DataPath.

27.    General Dynamics did not request information from DataPath before submitting a proposal in response to RTEP W15P7T-07-R-L435 (WINT 0014) and, on information and belief, General Dynamics submitted its own Type 5 satellite terminal as part of its proposal in response to RTEP W15P7T-07-R-L435 (WINT 0014), instead of submitting DataPath's Type 5 satellite terminal, as the Teaming Agreement required.

28.    The Government has awarded General Dynamics a Delivery Order under RTEP W15P7T-07-R-L435 (WINT 0014).

29.    The Government is likely to issue amendments to or exercise options concerning RTEP W15P7T-07-D-L435 (WINT 0014) that call for delivery of additional satellite terminals. The exact quantity of additional satellite terminals is unknown but could easily equal 36 times the number of satellite terminals to be delivered under the base award.

30.    Pursuant to Teaming Agreement, General Dynamics is obligated to obtain from DataPath all Type 5 satellite terminals for the Delivery Order issued under RTEP W15P7T-07-R-L435 (WINT 0014), including all amendments to and options under that Delivery Order.

31.    General Dynamics has not requested DataPath to begin production of Type 5 satellite terminals to meet the requirements of RTEP W15P7T-07-R-L435 (WINT 0014). In light of the aggressive delivery schedule under that delivery order, General Dynamics's failure to make such request is further confirmation of its intent to breach its

7

obligations to DataPath under the Teaming Agreement by not obtaining Type 5 satellite terminals from DataPath.

32.    General Dynamics would not have received the ID/IQ Contract without DataPath's assistance concerning Type 5 satellite terminals and, therefore, General Dynamics would not have received the Delivery Order under RTEP W15P7T-07-R-L435 (WINT 0014), without DataPath's assistance.

33.    DataPath would be damaged by General Dynamics's failure to purchase all Type 5 satellite terminals from DataPath for RTEP W15P7T-07-R-L435 (WINT 0014), in an amount that is based in part on the number of Type 5 satellite terminals initially required by that RTEP.

34.    DataPath does not have an adequate remedy at law for General Dynamics's breach of the Teaming Agreement because, *inter alia*, the total amounts of some of DataPath's money damages are too speculative to calculate.

35.    DataPath would be damaged by General Dynamics's failure to purchase all Type 5 terminals from DataPath under all amendments to and options under RTEP W15P7T-07-R-L435 (WINT 0014).  The total amount of additional damages associated with such amendments and options is too speculative to calculate at present because of the uncertainty about the exact number of Type 5 satellite terminals that may be added by amendments and options.

36.    DataPath would be damaged by General Dynamics's failure to purchase all Type 5 terminals from DataPath under all amendments to and options under RTEP W15P7T-07-R-L435 (WINT 0014), in an additional amount that is too speculative to calculate at present DataPath may lose opportunities under future Delivery Orders that

8

the Government may issue under the ID/IQ Contract but such opportunities are uncertain.

37.    DataPath would be damaged by General Dynamics's failure to purchase all Type 5 terminals from DataPath under RTEP W15P7T-07-R-L435 (WINT 0014), because DataPath may lose other future business opportunities, such as the future opportunity to participate in other ID/IQ contracts with the Government, but such opportunities are uncertain.

38.    DataPath would be damaged by General Dynamics's failure to purchase all Type 5 terminals from DataPath under RTEP W15P7T-07-R-L435 (WINT 0014), because losing these sales would throw an undue overhead burden on the remainder of DataPath's other contracts, cause DataPath to lose production personnel that it cannot readily employ without this work, and limit its opportunities for other work, including other Government work.

39.    All conditions precedent to this action and the grant of relief requested by DataPath have been performed or have occurred or have been waived, satisfied or excused.

## COUNT I
### (Interlocutory and Permanent Injunctive Relief)

40.    DataPath incorporates by reference and realleges the allegations contained in Paragraphs 1 through 39, as if fully set forth herein.

41.    To prevent immediate and irreparable injury, loss, or damage to DataPath, for which there is no adequate remedy at law, DataPath is entitled to an interlocutory injunction that immediately enjoins General Dynamics from either awarding a purchase

order or subcontract for Type 5 satellite terminals to any person other than DataPath or
manufacturing such terminals itself and providing them to the Government.

42.    DataPath is further entitled to the grant of a permanent injunction
restraining and enjoining General Dynamics from either awarding a purchase order or
subcontract for Type 5 satellite terminals to any person other than DataPath or
manufacturing such terminals itself and providing them to the Government.

## COUNT II
### (Specific Performance)

43.    DataPath incorporates by reference and realleges the allegations
contained in Paragraphs 1 through 42, as if fully set forth herein.

44.    DataPath and General Dynamics have agreed to all essential terms of an
agreement under which General Dynamics would purchase all Type 5 satellite terminals
from DataPath.

45.    DataPath is entitled to an order requiring specific performance of General
Dynamics's obligations to purchase all Type 5 satellite terminals from DataPath.

## COUNT III
### (Breach of Contract)

46.    DataPath incorporates by reference and realleges the allegations
contained in Paragraphs 1 through 45, as if fully set forth herein.

47.    DataPath is entitled to recover all direct damages incurred as a result of
General Dynamics's breach of the Teaming Agreement.

## COUNT IV
### (Attorneys' Fees)

48.    DataPath incorporates by reference and realleges the allegations
contained in Paragraphs 1 through 47, as if fully set forth herein.

10

49.     DataPath is entitled to attorneys' fees and costs in accordance with Article IX, Paragraph C of the Teaming Agreement.

### Prayer for Relief

WHEREFORE, Plaintiff DataPath, Inc. respectfully requests that Your Honorable Court issue an order that grants the following relief under Counts I-IV:

(1) imposes an interlocutory injunction that immediately enjoins General Dynamics from either awarding a purchase order or subcontract for Type 5 satellite terminals to any person other than DataPath or manufacturing such terminals itself and providing them to the Government;

(2) advances and consolidates the trial of the action of the merits on the claims for injunctive relief and specific performance with the hearing of this application;

(3) permanently enjoins General Dynamics from either awarding a purchase order or subcontract for Type 5 satellite terminals to any person other than DataPath or manufacturing such terminals itself and providing them to the Government;

(4) grants specific performance of General Dynamics's obligations to purchase all Type 5 satellite terminals from DataPath;

(5) awards to DataPath all damages it incurred as a result of General Dynamics's breach of the Teaming Agreement

(6) awards to DataPath all its attorneys' fees in this action;

(7) casts all costs of this action on General Dynamics; and

(8) grants such other and further relief as this Court deems just and proper.


Respectfully submitted this 31st day of August, 2007.

11

George D. Wenick
Ga. Bar No. 748160

Reginald M. Jones
Ga. Bar No. 403847

SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Ave., NE
Atlanta, Georgia 30303-1227
Phone:   404-521-3800
Fax:   404-688-0571

**ATTORNEYS FOR DATAPATH, INC.**

12

## VERIFICATION

**STATE OF GEORGIA** §
§
**COUNTY OF GWINNETT** §

PERSONALLY APPEARED before me, an officer duly authorized by law to administer oaths, Steven R. Wilson, who after first being duly sworn, states:

The allegations set forth in the foregoing Complaint and Application for Injunctive Relief for and on behalf of DataPath, Inc. are true and correct according to the records, files, and information available to DataPath, Inc.

_____
David J. Hall

Sworn to and subscribed before me
this 30th day of August, 2007.

_____
NOTARY PUBLIC

My Commission Expires: _____ CORLISS FALGOUT CHAMBERS
Notary Public, Gwinnett County, Georgia
My Commission Expires March 19, 2009.



12

# Teaming Agreement – U.S. Government Program

This Teaming Agreement, together with the exhibits and attachments hereto ("Agreement"), effective as of the 18th day of January 2006, is between RSI Maryland, Inc., trading as VectorRSI, a Delaware corporation, ("VectorRSI"), with a place of business located at 4825 River Green Parkway, Duluth, Georgia 30096 and DataPath, Inc., a Georgia corporation, ("TEAMMATE"), with a place of business located at 2450 Satellite Boulevard, Duluth, Georgia 30096 (individually a "Party" and collectively referred to as the "Parties"). VectorRSI is a wholly-owned subsidiary of General Dynamics SATCOM Technologies, Inc.

## I.  Definitions

**A.** "Government" shall mean Project Manager, Defense Communications and Army Transmission Systems and Project Manager, Warfighter Information Network-Tactical.

**B.** "Program" shall mean the Government's program to acquire six terminal configurations for the World-Wide Satellite Systems program.

**C.** "SOW" shall mean the Statement of Work for subcontract work set forth in Attachment 1 (attached) of this Agreement.

## II.  Background

**A.** The Government has a requirement for the Program and has, or intends to issue a Request for Proposal ("RFP") for this requirement.

**B.** VectorRSI has extensive experience, skills and capabilities of a proven provider of products and systems as well as complete life cycle and logistics support for US ARMY tactical military communication systems. TEAMMATE has extensive experience, skills and capabilities in the field(s) of providing terminals to the US ARMY. The Parties believe that combining these diverse and complementary skills and capabilities as a contractor team will offer the Government a superior combination of performance, cost, and delivery schedule to meet the Government's requirement for the program.

**C.** VectorRSI intends to prepare and submit to the Government a proposal in response to the RFP for a prime contract (the "Proposal") and to organize a contractor team, in accordance with FAR 9.6, capable of submitting a proposal and performing the contract awarded based on the RFP for the Program.

**E.** TEAMMATE wishes to participate in the preparation of the VectorRSI proposal as a team member and to execute and perform a subcontract with VectorRSI for the work described in Attachment 1 if VectorRSI is awarded a prime contract by the Government.

**F.** The Parties have previously entered into a non-disclosure agreement dated September 15, 2005 ("NDA") related to the Program, which is hereby incorporated into this Teaming Agreement, made a material part hereof by this reference, and the expiration date shall remain as set forth in the NDA.

Now, with the foregoing Background intended to form an integral part of this Agreement, and in consideration of mutual promises contained herein, the Parties agree as follows:

Page 1

EXHIBIT A

## II.   Scope of Responsibilities

A.   VertexRSI shall act as the prime or higher tier contractor and TRAM/ATB shall act as a subcontractor to VertexRSI. VertexRSI shall prepare the Proposal in response to the RFP, integrate the data provided by TRAM/ATB, and submit the Proposal to the Government. VertexRSI shall provide appropriate and qualified personnel and will exert its best effort to become the successful offeror for the prime contract solicited by the RFP.

B.   TRAM/ATB shall provide appropriate and qualified personnel and use its best efforts to prepare a proposal to VertexRSI for the work described in the SOW in the format requested by VertexRSI, and to support VertexRSI in the preparation of the Proposal in response to the RFP, including all reasonable information and material including without limitation representations and certifications necessary for the timely and effective presentation in the Proposal of the technical and schedule aspects of the work described in the SOW.

C.   TRAM/ATB shall provide to VertexRSI an accurate cost or price proposal for the SOW in sufficient detail to be responsive to the RFP and to permit negotiation of a Prime Contract with the Government and a subcontract between the Parties. Such information shall be in format suitable for inclusion in the VertexRSI Proposal. TRAM/ATB may, at its option, submit its proprietary supporting cost or pricing data directly to the Government or appropriate Government audit agency as required.

D.   VertexRSI shall conduct all negotiations with the Government. At the request of VertexRSI, TRAM/ATB shall provide reasonable support to VertexRSI including participation in technical and matching presentations, fact-finding meetings, oral and written discussions, contract negotiations, and preparation of revised proposals, if necessary. TRAM/ATB shall not contact the Government regarding the Proposal without the prior written approval of VertexRSI.

E.   VertexRSI shall disclose the relationship with TRAM/ATB to the Government in the Proposal. VertexRSI shall include appropriate recognition of TRAM/ATB's participation in and contributions to the Proposal and a recommendation of TRAM/ATB as the subcontractor for the portion of the prime contract assigned to TRAM/ATB by the SOW.

F.   VertexRSI shall have the responsibility and discretion to negotiate the total prime contract price with the Government. If the Government requests VertexRSI to reduce its prime contract price, VertexRSI agrees to discuss any proposed reduction with TRAM/ATB, and TRAM/ATB agrees to negotiate in good faith with VertexRSI with the objective of bearing its fair share of such proposed reduction. VertexRSI may withdraw the Proposal without liability of any kind to TRAM/ATB if VertexRSI believes that (i) VertexRSI does not have a reasonable chance of receiving award at a price that provides VertexRSI a reasonable profit or (ii) if agreement is not reached with either (a) the Government on the prime contract price or (b) any necessary or potential subcontractor or teammate on a price reduction. In lieu of withdrawing the Proposal, VertexRSI may, following a Government request for a price reduction, remove TRAM/ATB from the contractor team should TRAM/ATB decline to reduce its price by the requested amount or percentage.

Page 3

G. In the event of a dispute between the Parties, TRAMMATH shall, pending final disposition of such dispute, proceed diligently with its performance hereunder unless otherwise requested by VerberRSI.

## IV. Exclusivity/Relationship of the Parties

A. Under this Agreement, neither Party shall be bound on an exclusive basis. Either Party may individually or jointly with any third party offer to the Government, the U.S. government, or any third party any proposal with respect to the Program covered hereunder, or enter into any agreement with any such third party with respect to said Program. Neither Party shall, during the term of this Agreement, undertake any action or communicate any Confidential Information to any third party which may adversely affect any work of the other Party concerning the subject of this Agreement.

B. Nothing in this Agreement shall restrict either Party from marketing, promoting, quoting, leasing, licensing, or selling (or offering to do so) any of the foregoing its standard items or services that is regularly offers for sale.

C. Nothing in this Agreement precludes either Party from bidding or contracting independently of the other on the Program or any other U.S. government or industry program that may develop or arise (even in the general area of business related to this Agreement); provided that neither Party shall, during the term of this Agreement.

D. Each Party herein shall act as an independent contractor and act as an agent for, partner of, or joint venturer with the other Party hereto. Unless agreed to in writing, neither Party shall make any commitment, representation, warranties, or agreement binding on the other Party, nor will either Party represent itself as having authority to do so. There shall be no joint control, joint property, joint liability for losses and expenses or joint participation in profit or losses. No relationship, other than that created by and set forth in this Agreement, shall be established by any reference to the Parties operating as a "team" or as "team members." Except as otherwise expressly provided herein, each Party shall bear all expenses, costs, risks, and liabilities it may incur in connection with its obligations and efforts hereunder.

## V. Subcontract

Expressly conditioned on VerberRSI's receipt of a prime contract for the Program described in the RFP which includes the performance of the work set forth in Attachment 1 hereto for which TRAMMATH is responsible:

A. The Parties shall negotiate in good faith a subcontract for the work described in the SOW, on reasonable terms and conditions, which shall include (i) those terms and conditions in the prime contract that VerberRSI must include in the subcontract (ii) VerberRSI's standard terms and conditions for subcontracts except as modified by mutual agreement of the parties and (iii) other terms and conditions negotiated in good faith between the Parties. Any such subcontract will be subject to all applicable laws and regulations and such terms and conditions which are required or reasonably implied in order to perform the subcontract as well as a clause permitting VerberRSI to terminate the subcontract for

convenience in the event the Government (i) terminates for convenience the prime contract in its entirety or (ii) terminates for convenience that portion of the prime contract for which TEAM/ATH is responsible.

B.  If the subcontract is subject to Government approval, VertexRSI shall take reasonable action, including providing the opportunity for TEAM/ATH to discuss with Government directly its qualification, to obtain the Government's approval of the proposed subcontract. In the event the Government does not approve the proposed subcontract, VertexRSI shall have no inability to TEAM/ATH and may propose other entities for the work that would otherwise have been subcontracted to TEAM/ATH.

VI.  Intellectual Property Rights and Confidential Information

A.  The Intellectual Property (defined below) that is the subject of the following paragraphs of this provision or "Intellectual Property" may be or may become subject to rights of either ownership or of license to the Government in discoveries, improvements, inventions, or Proprietary Information generated or developed under any prime contract or subcontract with the Government related to the subject matter of this Agreement. The following paragraphs govern Intellectual Property rights during this Agreement since and do not govern the Intellectual Property rights retained in any subsequent contract for the Program.

B.  "Intellectual Property" means all of the following: (i) discoveries, improvements, inventions (whether or not patentable); (ii) patents, patent applications, patent disclosures, and any other patentable subject matter; (iii) copyrights, applications to register copyrights, works of authorship and any other copyrightable works; (iv) computer software (including source code, executable code, databases, data and related documentation); (v) trade secrets, proprietary information and know-how; (vi) all improvements or modifications to any of the foregoing, and/or Proprietary Information.

C.  "Background Intellectual Property" or "BIP" shall mean all Intellectual Property owned or controlled by one of the Parties prior to this Agreement, or developed contemporaneously with this Agreement, but not arising from the performance of work under this Agreement. All BIP shall remain the property of the respective Party. Unless explicitly stated, no licenses to any Background Intellectual Property are granted under this Agreement.

D.  "Foreground Intellectual Property" or "FIP" means all Intellectual Property that is developed, created, conceived or reduced to practice by both Parties jointly in the performance of this Agreement. Each Party shall promptly disclose to the other Party any FIP of which it becomes aware. The Parties shall jointly own all FIP, and each Party hereby assigns to the other Party an equal undivided interest in and to such FIP. Each Party shall be free to use and exploit its FIP for any purpose without the consent of the other Party and without any duty to account or to pay royalties to the other Party, provided that nothing in this Section shall be deemed or construed to grant any rights in any BIP or other IP of either Party (other than FIP). The Parties shall mutually determine whether an application(s) for patent(s) shall be filed on such joint invention, the party who will prepare and file such application(s), and the countries in which such application(s) is to be filed. The Parties shall bear equally all out-of-pocket expenses incurred by either Party in connection therewith but only to the extent such expenses

Page 6

were incurred with the approval of both Parties. Notwithstanding the foregoing, if any Party elects not to file an application on such joint invention or not to share the expenses thereof, the other Party or Parties may file at its or their own expense and shall have sole control of the prosecution of such application and enjoy exclusive ownership of the invention, application(s), and any patent(s) which may be granted on such application(s) provided that such other Party or Parties notifies the Party electing not to file by registered mail at least fifteen (15) days in advance of such filing, and provided that the Party or Parties, electing not to file shall retain a nonexclusive, nontransferable, royalty-free license to make, use, or sell under such invention(s), application(s), and patent(s), without the right of sublicense other than to its parent, subsidiaries and affiliates.

E.  Any Intellectual Property made in the performance of this Agreement solely by the personnel of one Party ("New IP") shall be or remain the sole and exclusive property of that Party regardless of whether such New IP is conceived or reduced to practice thereafter.

F.  Joint Copyright: In the event that employees of the Parties jointly produce copyrightable material, it shall be jointly owned and copyrighted with rights reserved for both Parties and both Parties shall share the costs, if the copyright is registered.

G.  Confidential Information. During the term of this Agreement, either party may receive information which the other party regards as confidential and proprietary. The parties agree that all information which is clearly marked to indicate its confidential and/or proprietary status, if disclosed by one party to the other in written, graphic, recorded, photographic or any machine readable form, or, if disclosed orally is identified at the time of disclosure as confidential and reduced to writing within 30 days after disclosure, shall be considered "Confidential Information" and shall be subject to the provisions of the NDA.

H.  Restrictions on Disclosure. In the course of performance under this Agreement, either party may be required to disclose to the other Confidential Information. A party receiving Confidential Information (the "Receiving Party") shall use the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of Confidential Information as it uses to protect its own confidential information of a like nature. In performing this Agreement, the Receiving Party is authorized to incorporate Confidential Information specifically provided for the Proposal, in the Proposal, provided that any submission of such Confidential Information to the Government as part of the Proposal (A) complies with and includes the appropriate legends set forth in Federal Acquisition Regulation ("FAR") clause 52.215-1(e) or such other applicable procurement regulations and (b) if required by the solicitation, complies with applicable procurement regulations regarding data rights.

VII.  Term and Termination

A.  Either Party may terminate this Agreement, except for rights and obligations under Articles VI, VIII.D, VIII.E, VIII.F, IX.C, F, G and I, and for any rights and obligations under the NDA, upon the happening of any of the following events:

Page 5

1. The Government materially changes the requirements of the RFP; provided, however, that TRAMMATE may terminate under this provision only if the change materially affects the SOW as it pertains to the work to be performed under the SOW by TRAMMATE.

2. Twelve months have elapsed without the Government issuing an RFP for the Program.

3. The elapse of one (1) year after the issuance of an RFP; provided however, that this Agreement shall be extended by mutual agreement for a reasonable period of time for completion of pre-contract procurement activities by the Government, including review and approval of the prime contract award. If such have been initiated but not completed by the termination date of this Agreement. Further, if the RFP is issued through any part of the U.S. government, this Agreement may be extended by mutual written agreement for a reasonable time. (i) to secure the appropriate government contracting officer's consent/approval for the placement of the subcontract between VertexRSI and TRAMMATE, to the extent such consent/approval is required by the prime contract, or (ii) if the RFP is still viable and no award has been made.

4. Subject to Section V.A, failure of the Parties to reach mutually acceptable agreement on the terms and conditions of the proposed subcontract within ninety (90) days from the date of commencement of negotiations between VertexRSI and TRAMMATE.

5. The other Party is subject to an organizational conflict of interest that precludes performance of its responsibilities in connection with the Program.

B. This Agreement shall terminate, except for rights and obligations under Article VI, VII.D, VIII, IX.C, F,G and I upon the happening of any of the following events:

1. The Government announces the award of the prime contract contemplated by the RFP to a contractor other than VertexRSI.

2. The Government cancels the RFP and announces that it will not resolicit the requirement.

3. The Government fails to approve the proposed subcontract between VertexRSI and TRAMMATE or directs in writing a source other than TRAMMATE for the subcontract work identified in the SOW.

4. Award of a negotiated subcontract by VertexRSI to TRAMMATE that reflects the Parties' obligation set forth in this Agreement in which case the relationship between the Parties and shall supersede the terms hereof.

5. The assets of either Party become subject to a voluntary or involuntary petition for bankruptcy and such petition is not dismissed in a period of sixty (60) days.

6. the United States government determines that a Party has become ineligible to perform contract by suspension, debarment, or otherwise, for the United States government and such ineligibility is expected to continue for a period of sixty (60) days or more.

C. Either Party may terminate this Agreement for material breach of this Agreement, following written notification that the other Party has failed to perform its obligations

under this Agreement, including the failure of any Party to protect the proprietary information of the other Party as required hereunder or in the NDA, unless the defaulting Party cures such breach or default in all material respects within [30] days after receiving written notice of such breach.

D. In the event that this Agreement terminates with respect to a Party's interest in this Agreement pursuant to Section VIII.B.5, the bankrupt Party hereby grants to the other Party a paid up, worldwide, royalty-free license in any Intellectual Property of the bankrupt Party reasonably required by the receiving Party to complete its obligations to the Program; provided that such license is limited in scope to satisfying such obligations. Each Party agrees to execute any and all documentation reasonably necessary to provide third Parties evidence of the grant contained in this Section.

E. Notwithstanding anything that may be to the contrary in this Agreement, Victor/RSH may in its sole discretion without liability of any kind elect to not submit a proposal to the Government after reviewing the final RFP or any amendment to the RFP in which case, this Agreement shall terminate upon notification of such decision to TRA/AM/ATK.

VIII. Representations/Limitation of Liability.

A. Representations. Each Party to this Agreement represents and warrants to the other Party that: (a) such Party has the full corporate right, power and authority to enter into this Agreement and to perform all acts required of it hereunder, (b) the execution of this Agreement by such Party, and the performance by such Party of the obligations and duties hereunder, do not and will not violate any agreement to which such Party is a Party or by which it is otherwise bound, (c) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with the terms and conditions of this Agreement, (d) it is not subject to any pending or threatened litigation or governmental action that could interfere with its performance of this Agreement; and (e) such Party, in the performance of this Agreement, will comply with and be bound by all applicable laws, rules and regulations of the U.S. government including without limitation federal laws, rules and regulations of the U.S. government. Each Party shall require any consultants that it relates to gifts/gratuity and/or bribery laws. Information, advice or directions in connection with the work to be performed on such Party's behalf hereunder or in any manner connected with the RFP to comply with all reporting, disclosure and certification requirements under the RFP and any laws or regulations which now exist or may become effective during the term of this Agreement. Neither Party has been induced to enter into this Agreement by any representations or promises not specifically stated herein.

B. Export Licensing/ITAR Representation. Each Party agrees to comply with all applicable U.S. export and import laws and regulations, including the International Traffic in Arms Regulation (ITAR) governing the export of technical data and the provision of defense services related to this Agreement. Notwithstanding anything that may be to the contrary herein, the obligations of both Parties to adhere to U.S. export and import laws and regulation shall survive the expiration or termination of this Agreement. Each Party (the "First Party") shall indemnify and hold the other Party harmless from all claims, demands, damages, costs, fines, penalties, attorneys' fees, and other expenses arising from the First Party's breach of this clause.

C. **Conflict of Interest Representation.** Each Party agrees to comply with the Office of Federal Procurement Policy Act (41 USC 405(b)) implemented by FAR Subpart 9.5; the Procurement Integrity Act (41 USC 423) implemented by FAR Section 3.104; the "Byrd Amendment" (31 USC 1352), as amended by the Lobbying Disclosure Act of 1995 and implemented by FAR Subpart 3.8.

D. **LIMITATION OF LIABILITY. EXCEPT AS MAY BE PROVIDED FOR IN THE NDA INCORPORATED INTO THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES ARISING FROM ANY PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF USE, INCOME OR PROFITS, OR ANTICIPATED PROFITS OR LOST BUSINESS OR THE COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES.**

**IX. Miscellaneous .**

A. **Notices.** Unless otherwise provided in this Agreement, a Party shall give any notice required under this Agreement in writing and shall send the notice to the following address.

| VerexRSI | TEAMMATE |
|---|---|
| Name: William K. Clark, Jr. | Name: David Hall |
| Address: 4825 River Green Parkway Duluth, GA 30096 | Address: 2450 Satellite Boulevard Duluth, GA 30096 |
| Telephone: 770-689-2005 | Telephone: 678-597-0500 |
| Facsimile: 770-476-7092 | Facsimile: 678-597-0501 |
| E Mail: Bill.clark@rsistcom.com | E Mail: dhall@dataumh.com |

B. **Publicity.** Each Party shall obtain prior written approval from the other Party before issuing any news release, public announcement, advertisement, or publicity concerning any matters related to the other Party's activities regarding the Program or this Agreement.

C. **Law/Venue.** This Agreement shall be deemed to have been executed and delivered within the Commonwealth of Virginia and the rights and obligations of the Parties shall be construed and enforced in accordance with, and governed by, the laws of such State without regard to its conflict of laws principles. The Parties further agree and consent to accept service of process by certified or registered United States mail, return receipt requested, addressed as provided herein. In the event that an action is commenced by either Party with respect to this Agreement, the substantially prevailing Party shall be entitled to recover its costs and attorneys' fees from the other Party.

Page 8

D.  **Severability.**  It is agreed that the invalidity or illegality of one or more provisions of this Agreement shall not affect the enforceability of the remaining provisions.

E.  **Assignment.**  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Neither Party may assign, or transfer its rights or obligations as provided in this Agreement without the prior written consent of the other, provided, however, that either Party may, without consent, assign this Agreement as a result of a merger or a sale of all or substantially all of its assets or stock of that Party or to a parent, subsidiary or affiliate as part of any internal reorganization.

F.  **Arbitration.**  Except with respect to: claims regarding a breach of obligations related to the NDA; exclusivity under this Term; any Agreement; infringement or misappropriation of Intellectual Property Rights; or requests for injunctive relief of any kind (including without limitation the right of a Party to apply to a court of competent jurisdiction for a temporary restraining order, preliminary injunction or other equitable relief to preserve the status quo or to prevent irreparable harm); all claims, disputes, controversies, or other matters in question arising out of, connected with, or relating to the Agreement that cannot be resolved by the Parties through face-to-face negotiations between senior executives of each Party, will be settled by binding arbitration in accordance with the Commercial Rules of the American Arbitration Association then in effect. All arbitration proceedings will be held in the Washington, D.C. area. The Parties may take discovery by any means allowed by the Federal Rules of Civil Procedure then in effect. The arbitrator may exclude from evidence any evidence not previously shared with the other side. The cost of any arbitration or litigation will be borne equally by the Parties pending the arbitrator's award. The prevailing Party in any arbitration proceeding or litigation hereunder will be entitled, in addition to any other relief granted to it, to recover reasonable attorneys' fees and the costs incurred in connection with the arbitration or litigation. The arbitrator shall be bound by the express provisions set forth in this Agreement and by the substantive law of the courts of the Commonwealth of Virginia that relate to any controversy arising from this contract; and shall not modify any terms of this Agreement or make any award of damages in excess of the amounts set forth in this Agreement or grant any relief not expressly set forth in this Agreement. The determination of the arbitrator shall be final and, except as provided by law, shall not be subject to judicial review. Any court of competent jurisdiction may enforce any award or determination rendered by the arbitrator. The language to be used in the arbitral proceedings shall be English. The arbitral tribunal shall not have the authority to award consequential damages of any sort (which are defined to include, without limitation, damages for lost profits, damages for delay, damages for lost opportunities and the like) or special, punitive exemplary damages of any sort. The arbitral tribunal shall include in any award of damages prejudgment interest at the current 30-year U.S. Treasury Security rate simple interest per annum.

G.  **Entire Agreement.**  This Agreement sets forth the entire understanding between the Parties and supersedes any previous or contemporaneous understandings, commitments, or agreements, written or oral, regarding the subject matter hereof. The Parties do not intend by this Agreement to modify the terms of any separate agreement not mentioned herein. Any amendment, supplement, modification or change to this Agreement shall be

Page 2

In writing and signed by each Party. No other act, document, usage or custom shall be deemed to amend or modify this Agreement.

**H.**  **Headings.** The headings and sub-headings included in this Agreement are for convenience only and do not in any way alter or affect the terms of this Agreement.

**I.**  **Survivability.** This article and the following articles: VI (Intellectual Property); VIID (Bankruptcy)); VIIB (IMAR); VIILD (Limitation of Liability); and IX.C (Law/Venue), F (Arbitration), G (Entire Agreement) and the NDA shall survive termination of this Agreement.  :

**J.**  **Force Majeure.** Neither Party is liable or deemed to be in default for any delay, interruption or failure in performance under this Agreement resulting from the following events: acts of God, acts of civil or military authority; acts of the public enemy; war; accidents, fires, explosions, power surges, earthquakes, floods, or unusually severe weather; strikes or labor disputes; terrorism or threats of terrorism; delays in transportation or delivery outside the reasonable control of the Affected Party; epidemics; and any similar event beyond the Affected Party's reasonable control ("Force Majeure Event").

**K.**  **Waiver.** The failure of either Party to insist upon the performance of any provision herein or to exercise any right or privilege granted to it hereunder, shall not be construed as a waiver of such provision or any provisions herein, and the same shall continue in full force. The various rights and remedies given to or reserved by either Party herein or allowed by law, shall be cumulative, and no delay or omission to exercise any of its rights shall be construed as a waiver of any default or acquiescence, nor shall any waiver of any breach of any provision be considered a condonation or any continuing or subsequent breach of the same provision.

IN WITNESS OF THIS AGREEMENT, the Parties, through their authorized representative, have entered this Agreement in duplicate original copies.

| VertexRSI | DrinPrab, Inc. |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| Title: _General Manager_ | Title: _C.E.O_ |
| Date: _1-19-06_ | Date: _4/19/06_ |

## Attachment 1
## STATEMENT OF WORK

As a first-tier subcontractor, TRADM/ATE shall be responsible for the following portions of the Program as described below.

**Proposal Preparation Activities.** In support of the WWSS proposal effort Datapath will provide descriptions of the terminals addressing the requirements in the sample tasks.

**Subcontract Performance Responsibilities.** Datapath will be the exclusive provider of the complete terminals in accordance with the requirements stated in sample tasks 5 and 6 of the WWSS solicitation. Additional services in support of these terminals will be mutually agreed upon with further discussions.

GD will also consider any specific Delivery Order proposal from Datapath for the other terminals in accordance with the requirements stated in sample tasks 1 – 4 of the WWSS solicitation on a case-by-case basis. Specific preference will be given to a DataPath Delivery Order proposal for those terminals where DataPath has an existing customer relationship and has been influential in the development of the specifications for the Delivery Order requirements.

**General Areas**

**Specific Areas by WBS**

**Methodology to Establish Pricing:** Datapath shall also provide pricing for the terminals and agree service to support the WWSS pricing proposal.

**GENERAL DYNAMICS**
C4 Systems

# Reciprocal Proprietary Information Non-Disclosure Agreement
## NDA Control Number 6902

This Agreement entered into by and between General Dynamics C4 Systems, Vertex Communications Corporation, d/b/a VertexRSI, located at 2600 N. Longview Street, Kilgore, TX 75662 (hereinafter called "VertexRSI"), and DataPath, Inc. (the "Company") located at 2430 Satellite Boulevard, Duluth, Georgia 30096, VertexRSI and Company may each be considered a disclosing Party ("Discloser") and a receiving Party ("Recipient") under this Agreement. VertexRSI and Company may be individually referred to in this Agreement as "Party" or collectively as "Parties", and this Agreement is effective upon the date of the last person to sign the Agreement.

**1.    Purpose and Use of Information.** A Recipient may use Proprietary Information disclosed under this Agreement for the purpose of preparing a proposal/performing a contract or subcontract for the supply of VertexRSI mobile communication products (the "Purpose") during the term of this Agreement.

**2.    Definition of Proprietary Information.** "Proprietary Information" means all information that is identified as Proprietary Information by the Discloser and is disclosed by the Discloser under this Agreement. Proprietary Information shall not include information that was:

(a)     public or other than by, or known to, available to the public other than by breach of this Agreement;

(b)     lawfully received from a third party without restriction on disclosure and without breach of this Agreement;

(c)     already known to the Recipient and the Recipient can demonstrate that the information was known without breach of this Agreement;

(d)     developed independently by the Recipient organization without access to or use of the Proprietary Information; or

(e)     approved for public release or disclosure by the Discloser in writing.

**3.    Identification Procedures.** A Discloser will clearly and conspicuously mark, written or documentary, recorded, machine readable and other information in a tangible form relating to VERTEXRSI Proprietary Information or Company Proprietary Information using an appropriate legend. Proprietary Information stored in electronic form on disk, tape, or other storage media will be considered to be adequately marked if a legend following the information as proprietary disclosure made the information originally came on a computer system and when the information is printed from the data file. A Discloser shall identify Proprietary Information originally disclosed in some other form (i.e., orally or visually) by (a) identifying the information as proprietary at the time of original disclosure, (b) summarizing the Proprietary Information in writing sufficiently specific to enable Recipient to identify the information contained as proprietary by the Discloser, (c) marking the written summary clearly and conspicuously with an appropriate legend, and (d) delivering the written summary to the Recipient within thirty (30) days following the original disclosure.

**4.    Limited Distribution.** A Recipient will limit access to Proprietary Information it receives, in whole or in part, to its employees who have a "need-to-know" that Proprietary Information for the above Purpose. A Recipient may disclose Proprietary Information to its contract labor personnel who have a need-to-know and who are under an obligation to hold said information in confidence under terms and conditions at least as restrictive as the terms and conditions of this Agreement. The Recipient will copy Proprietary Information only as reasonably necessary for the Purpose of the Agreement.

**5.    Duty of Care.** During the term of this Agreement and for a period of four years following the expiration or termination of this Agreement, the Recipient shall use at least the same degree of care in safeguarding Proprietary Information it receives to protect proprietary information of the Recipient provided such degree of care is reasonably calculated to prevent inadvertent disclosure or transferred and thereof. Upon discovery of any inadvertent disclosure by the Recipient or unauthorized use of Proprietary Information by the Recipient, Recipient shall promptly use reasonable efforts to retrieve such Proprietary Information and to prevent any further inadvertent disclosure or transferred use thereof.

VertexRSI

EXHIBIT B

**CONFIDENTIAL DYNAMICS**
C4 Systems

6.    Judicial Review/Disclosure.  A Recipient shall not be liable for disclosure of Proprietary Information required by the Disclosure if the Recipient is compelled by judicial or other governmental action, provided that the Recipient has notified the Disclosure promptly after such need became known and provides the Disclosure a reasonable opportunity to contest or limit the scope of such required disclosure and has cooperated with the Disclosure toward this end. Should the disclosing party decline to contest such disclosure, the receiving party may proceed to disclose such information at its option.

7.    Notice Address.  The primary points of contact for the transmittal of Proprietary Information, notice, and authorizations under this Agreement are as follows:

General Dynamics C4 Systems,
Vertex Communication Corporation d/b/a VertexRSI        DataPath, Inc.

By: _____                           By: _____
Typed Name:   Jeff Porter                                   Typed Name: _____
Title:    General Manager                                    Title: _____
Date: _____                          Date: _____

Either Party may re/designate its respective designated representative(s) by written or electronic notice to the other Party.

8.    U.S. Government Proposal Submittal.  If an expressly stated purpose of this Agreement is for the Recipient to submit a proposal to the U.S. Government, the Recipient may disclose Proprietary Information of the Disclosure to the U.S. Government on a confidential basis provided that such Proprietary Information contains a restrictive legend in accordance with Federal Acquisition Regulation (FAR) 52.215-1(e) for unbidded proposals and FAR 15.609 (b) for unsolicited proposals. Disclosures to the U.S. Government for any purpose other than those contemplated by such Regulation shall be subject to further written agreement of the Parties.

9.    Term and Termination.  This Agreement, unless extended in writing, by mutual agreement of the Parties, shall automatically expire one (1) year after the Effective Date of this Agreement. Either Party may terminate this Agreement at any time by giving thirty (30) calendar days written notice to the other Party of the intention to terminate. The rights and obligations to protect Proprietary Information disclosed prior to expiration or termination in accordance with the time period set forth in paragraph 5 of this Agreement shall not be affected by the expiration or termination of this Agreement.  Upon expiration or termination of this Agreement, each Party will cease all use of Proprietary Information received hereunder.

10.   Return of Proprietary Information.  Upon either (a) the request of the Disclosure, at any time during the term of this Agreement, (b) termination of this Agreement, or (c) the expiration of this Agreement, the Recipient will cease all uses of Proprietary Information received from the other Party and, within thirty (30) calendar days of such request, return all Proprietary Information received from the other Party and all copies thereof. Alternatively, if acceptable to the Disclosure, a Party may certify in writing that all such Proprietary Information has been destroyed. Each Party may retain one archival copy for use only in resolving a dispute concerning this Agreement.

11.   .  Limitation on Obligations.  This Agreement does not obligate any Party to disclose any information to the other Party. Each Party will bear its own costs and expenses it incurs in complying with this Agreement. The Parties are independent contractors and this Agreement does not obligate either Party to enter into a contract, subcontract, teaming agreement, joint venture, partnership, or other business relationship with the other Party.

12.   Disclosure of License.  Proprietary Information received by the Recipient under this Agreement shall remain the property of the Disclosure. The Recipient does not receive any right or license, express or implied, under any patents, copyrights, trade secrets, or the like of the Disclosure under this Agreement except the limited rights to use the Proprietary information to carry out the purposes during the term of this Agreement.

VertexRSI

**GENERAL DYNAMICS**
C4 Systems

13. **Disclaimer of Warranty.** All Proprietary Information is provided without representation or warranty of any kind.

14. **Transfer/Assignment.** A Party may not transfer or assign this Agreement without the prior written approval of the other Party, provided, however, that such approval shall not be necessary in the context of an acquisition of such party by asset sale, merger or change of control, or upon the assignment of this Agreement in part or in whole to a subsidiary or affiliated company, controlled by, or under control with, the assigning party. This Agreement inures to the benefit of, and is binding upon, the successors, permitted assigns, and personal representatives of the parties hereto.

15. **Governing Law and Venue.** This Contract shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without resort to its conflict of laws rules. If a court of competent jurisdiction determines one or more provisions of this Agreement illegal or invalid, that determination shall not affect the enforceability of the remaining provisions to the extent they can be given effect without the illegal or invalid provision.

16. **Export Control.** U.S. export laws are contained in the International Traffic in Arms Regulation (ITAR) and the Export Administration Regulation (EAR) is applicable to any controlled technical data provided under this Agreement. Any such controlled technical data is not to be placed in the public domain, exported from the U.S., or given to any foreign person in the U.S., without the prior, specific written authorization of the Directorate of Defense Trade Controls, and the U.S. Department of State or the U.S. Department of Commerce as applicable. A foreign person is any individual who is not a U.S. citizen or lawful permanent resident in possession of an Immigration and Naturalization Service I-551 "Alien Registration" (a.k.a. "Green Card").

17. **Publicity.** Except as required by law, neither Party shall issue any press release or make any other public statement relating to this Agreement, may not disclose under this Agreement or any of the transactions contemplated by this Agreement without obtaining the prior written approval of the other Party as to the content of such press release and publication of such press release or public statement.

18. **Entire Agreement.** This Agreement contains the entire understanding between the Parties. It supersedes all prior or contemporaneous communications, agreements, or understandings between the Parties about the exchange and protection of Proprietary Information provided under this Agreement. A modification of this Agreement is not binding unless the modification is in writing and signed by authorized representatives of both Parties.

IN AGREEMENT, the Parties sign duplicate originals of this Agreement.

General Dynamics C4 Systems,
Vertex Communication Corporation (the Vertex RSI)

By: _____          By: _____
Type: _____          Type: LARRY A. BELLESTEIN
Title: General Manager               Title: C.F.O.
Date: _____          Date: 1/18/06

General Dynamics Inc.

**GENERAL DYNAMICS**
SATCOM Technologies

In reply, refer to:
W002 (CA12922) (Rev. 2)

22 June 2007

VIA E-Mail

DataPath, Inc.
2450 Satellite Boulevard
Duluth, GA 30096-5801

Attention:      Mr. Kevin McCann
                Sr. Contract Administrator

Subject:        Letter Subcontract No. SATCOM-2007-01-11 Rev. D

Reference:      (a)   SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002, Support
                      Wide Area Network (SWAN)
                (b)   SATCOM Letter CA12908 Dated 29 MAR 2007

Enclosure:      (1)   Exhibit A – Warranty and Warranty Service
                (2)   Exhibit B - Flow-Down Clauses

Dear Mr. McCann,

General Dynamics SATCOM Technologies, Inc. (SATCOM) amends the subject Letter Subcontract based solely upon the referenced (a) delivery order to (i) exercise an option of an additional qty. 15 Satellite Transportable Terminals (STTs) and qty. 10 STT spares kits, (ii) include additional optional quantities, and (iii) detail the respective terms and conditions.

The supplies and services covered by the previous Letter Subcontract No. SATCOM-2007-01-11 Rev. C are described below:

    Qty. 10 – AN/TSC-167B (V) 1 (JNN) - JNN Lot 9 STT, with upgraded Mitoq BUC for 13.75 – 14.50 GHz, "MaxView Installation for Lot 9" Monitor and Control System (which consists of TMComm 1.4.13.3; Broker 3.1.13.0; Logger 2.2.6.0; Wrapper 3.1.0; GUI Server 5.3.5.0; Utility Server 6.0.4.0; and Aperia 5.3.6.1) and O&M Manuals. $402,161.00 each

    Qty. 10 – CX11230 Triax Connector Interface. $2,650.60 each

    Qty. 10 – AN/TSC-167B (V) 1 (JNN) - JNN Lot 9 STT Spares Kit. $148,285.00 each

    NOTE: In order to cover the discount for the initial qty. 10 STT and qty. 10 STT spares units ordered under Letter Subcontract No. SATCOM-2007-01-11 Rev. C, an additional $7,500.00 credit shall be applied to each of the next qty. 40 STTs and $1,250.00 credit shall be applied to each of the next qty. 40 STT spares kits. Thus, the resulting unit price for the qty. 15 STTs under Rev. D above is $367,511.50 ($374,611.50 less $7,500.00) and qty. 10 STT spares kits under Rev. D above is $142,035.00 ($143,285.00 less $1,250.00).

4825 River Green Parkway
Duluth, Georgia 30096
Tel: 770 497 8800
Fax: 770 475 7092
www.gdsatcom.com

**EXHIBIT C**

22 JUN 2007
Page 2

The supplies and services covered by this Letter Subcontract No. SATCOM-2007-01-11 Rev. D are described below:

Qty. 15 – ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT, with upgraded Mteq BUC for 13.75 – 14.50 GHz, TMaxView Installation for Lot 9", Monitor and Control System (which consists of TMComm 1.4.13.3, Broker 3.1.13.0, Logger 2.2.6.0, Wrapper 3.1.0, GUI Server 6.3.5.0, Utility Server 6.0.4.0, and Aperio 5.3.6.1), CX11230 TMax Connector Interface, and O&M Manuals, less the $7,600.00 modification, $307,311.00 each ($372,161.00, plus $2,850.00 for the CX11230 modification, less the $7,600.00 credit per STT)

Qty. 10 – ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT Spares Kits, $142,03,500.00 each ($143,285.00 less $1,250.00 credit per STT spares kit)

OPTIONS for the referenced (or) delivery order:

OPTION FOR INCREASED QUANTITIES: SATCOM may increase the quantity of supplies called for in the schedules below at this unit price specified solely in satisfaction of orders placed by the U.S. Government under Contract No. W15P7T-06-D-1219, Delivery Order 0002 [Support Wide Area Network (SWAN)"]. Both SATCOM and DataPath, Inc. (DataPath) shall agree on the delivery schedule for any of the options exercised below.

OPTION PRICING:

ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT, with upgraded Mteq BUC for 13.75 – 14.50 GHz, TMaxView Installation for Lot 9", Monitor and Control System (which consists of TMComm 1.4.13.3, Broker 3.1.13.0, Logger 2.2.6.0, Wrapper 3.1.0, GUI Server 6.3.5.0, Utility Server 6.0.4.0, and Aperio 5.3.6.1), CX11230 TMax Connector Interface, and O&M Manuals. Quantities 1 – 25, $367,311.50 each

ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT, with upgraded Mteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System, CX11230 TMax Connector Interface, and O&M Manuals. Quantities 26+, $377,511.50 each

ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT Spares Kit. Quantities 1 – 35, $142,035.00 each

ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT Spares Kit. Quantities 31+, $143,285.00 each

NOTE: Option pricing is valid from 13 JUN 2007 to 20 DEC 2010, and does not include the quantities purchased prior to or exercised by this Letter Subcontract No. SATCOM-2007-01-11 Rev. D, which are (A) 35 ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT, and Qty. 20 ANTSC-1678 (V) 1 (JNN) – JNN Lot 9 STT Spares Kits.

Conditions upon which the above credit and upon pricing are based:

DataPath shall be the sub exclusive provider of the STT under Contract No. W15P7T-06-D-1219, Delivery Order 0002 [Support Wide Area Network (SWAN)"] or any amendment under Delivery Order 0002.

SATCOM shall not promote the variation of the STT under Contract No. W15P7T-06-D-1219, Delivery Order 0002 [Support Wide Area Network (SWAN)"] or any amendment under Delivery Order 0002.

22 JUN 2007
Page 3

DataPath shall deliver the qty. 15 STTs and 10 Spares Kits per the following schedule:

Qty. 2 STTs/Qty 2 Spares Kits — deliver 30 JUN 2007
Qty. 6 STTs/Qty 6 Spares Kits — deliver 30 AUG 2007
Qty. 7 STTs/Qty 2 Spares Kits — deliver 30 OCT 2007

NOTE: DataPath is allowed to deliver the current additional qty. 15 STTs and qty. 10 Spares Kits before 30 JUN 2007. On 28 JUN 2007, SATCOM shall inspect and accept any STTs and Spares Kits that are available at DataPath's facility. For any STTs or Spares Kits that are available after 28 JUN 2007, SATCOM shall inspect and accept within ten (10) calendar days after written notification.

DataPath shall pay to SATCOM's Kidron Facility an additional $5,000.00 per antenna subsystem (not including the qty. 10 antenna subsystems for the initial qty. 10 STTs under this Letter Subcontract) for future orders directly related to SATCOM's prime Contract No. W15P7T-05-D-L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"]. The additional per antenna amount will directly correlate to the quantity exercised by SATCOM (example: qty. 15 STTs exercised in this delivery order, therefore $75,000 additional payment from DataPath to SATCOM will be made for those antenna products). If for some reason DataPath purchases a lesser quantity of antenna subsystems to fulfill an order, then the $5,000 payment per antenna subsystem will still be applied to the quantity exercised by SATCOM and not the quantity purchased by DataPath.

DataPath shall be the exclusive provider of Field Service Representatives (FSRs) for Contract No. W15P7T-05-D-L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"] or any amendment under Delivery Order 0002 [Iraq and Horn of Africa only], provided the FSR options are exercised by the Government, and DataPath and SATCOM negotiate a mutually agreed upon price for Horn of Africa and Iraq.

DataPath shall not charge any storage fees or the like, for storage of STTs or STT spares kits shipped in place at DataPath, for a period of 12 months, commencing on the acceptance date of said STTs or STT spares kits.

Additional terms and conditions:

Terms and conditions of this Letter Subcontract take precedence over the terms and conditions on the reverse side of any purchase order issued by SATCOM under the SWAN program.

DataPath's standard 1-year warranty and warranty service (see Exhibit A) shall apply [reference e-mail to B. Clark from D. Hall at 3:38PM on 27 APR 2007].

DataPath and SATCOM agree to negotiate in good faith data rights in accordance with applicable FAR/DFAR clauses mentioned below for technical data delivered and to be delivered under Contract No. W15P7T-05-D-L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"].

The FAR/DFAR flow downs (see Exhibit B), except as modified by this Letter Subcontract, shall apply. For the avoidance of doubt, as Note 3 clearly states in Exhibit B, DataPath will be dealing directly with the US Government concerning any Data Rights issues and no Data Rights have been transferred or will transfer, directly or indirectly to SATCOM.

22 JUN 2007
Page 4

SATCOM authorizes DataPath to ship (Ex Works INCOTERMS 2000) each ordered item above to:

> General Dynamics SATCOM Technologies
> 4825 River Green Parkway
> Duluth, Georgia 30096

DataPath shall send invoices to:

> General Dynamics SATCOM Technologies
> Attn:  Accounts Payable
> 4825 River Green Parkway
> Duluth, Georgia 30096

> After inspection and Acceptance by SATCOM at either (i) DataPath's facility for any shipped-in-place units or (ii) SATCOM's Duluth Facility, SATCOM shall pay the invoice net 30 from the date of invoice.  Payment shall be made via check.

Letter Subcontract No. SATCOM-2007-01-11 Rev. D authorizes DataPath to make additional expenditures of $6,930,024.00 for the qty. 15 STTs and qty. 10 Spares kits detailed above.  In total, DataPath is not authorized to make expenditures or incur obligations hereunder that exceed $12,460,990.00.  A firm fixed price type definitive purchase order no. 2038965 is contemplated to incorporate this Letter Subcontract.  This Letter Subcontract is a DOA7 rated order under DPAS.

DataPath's acceptance of this amended Letter Subcontract is expressly conditioned on SATCOM's assent to the terms and conditions of that letter agreement between SATCOM and DataPath dated 02 APR 2007 sent from J. Wolfersberger to R. Fioravanti.  SATCOM's execution of this Letter Subcontract constitutes such assent.

Please provide your written confirmation and acceptance of this amended Letter Subcontract by close of business 25 JUN 2007.  Please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

General Dynamics
SATCOM Technologies

William K. Clark, Jr.
Director of Contracts
Programs, Duluth Facility

Accepted and Agreed:
DataPath, Inc.

By:
Title:   Jim Modak 6/23/07
CFO

cc:    M. Shoemake
       C. Buck
       R. Fioravanti
       M. Ghenouni
       R. Morefield

EXHIBIT A

WARRANTY AND WARRANTY SERVICE

*1.* **Manufacturer's Warranty.** Where a company other than DataPath manufactures components, accessories or systems, DataPath shall assign to BUYER its right, title and interest in and to any such equipment warranties, which it may receive as the initial purchaser of the equipment, component, system or accessories. Where an instrument of assignment is appropriate, DataPath shall prepare and execute such assignment to BUYER as may be required under the Agreement.

**2. DATAPATH WARRANTY. EXCEPT AS OTHERWISE PROVIDED IN THE AGREEMENT RESPECTING THE SOFTWARE LICENSE AGREEMENT AND THE SOFTWARE MAINTENANCE AGREEMENT ATTACHED HERETO, DATAPATH WARRANTS ITS PRODUCTS SOLD UNDER THIS AGREEMENT SHALL BE FREE FROM MATERIAL DEFECTS CAUSED BY FAULTY MATERIAL OR POOR WORKMANSHIP AND SHALL FUNCTION SUBSTANTIALLY IN ACCORDANCE WITH THE TECHNICAL SPECIFICATION AS ESTABLISHED UNDER THE STATEMENT OF WORK. EXCLUDING SERVICES, WHICH ARE WARRANTED ONLY FOR 90 DAYS, THE TERM OF THE DATAPATH WARRANTY SHALL BE 12 MONTHS FROM THE DATE OF DELIVERY OF THE PRODUCT, OR BUYER ACCEPTANCE, WHICHEVER OCCURS FIRST. THE SOLE LIABILITY OF DATAPATH UNDER THIS WARRANTY IS LIMITED TO ITS OBLIGATION TO REPAIR OR REPLACE THE PRODUCTS OR RE-PERFORM THE SERVICES THAT ARE DETERMINED AT THE SOLE OPTION AND DISCRETION OF DATAPATH TO BE DEFECTIVE. IF BUYER DOES NOT AGREE WITH DATAPATH'S DETERMINATION, AT BUYER'S EXPENSE, BUYER SHALL BE AUTHORIZED TO HIRE A THIRD PARTY TO MAKE AN INDEPENDENT ASSESSMENT OF DATAPATH'S DETERMINATION. IF THE THIRD PARTY DETERMINES THAT DATAPATH BREACHED THIS WARRANTY, DATAPATH MAY REPAIR OR REPLACE ANY SUCH DEFECTIVE PRODUCTS OR RE-PERFORM THE SERVICES, OR CREDIT THE ACCOUNT OF BUYER, WITH THE AMOUNT OF THE PURCHASE PRICE FOR SUCH DEFECTIVE PRODUCTS OR SERVICES. THE WARRANTIES EXPRESSED HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED AND OF ALL OTHER OBLIGATIONS OR LIABILITIES ON THE PART OF DATAPATH. BUYER SHALL NOT BE AUTHORIZED OR PERMITTED TO EXTEND THE TERMS OR CONDITIONS OF THIS WARRANTY. NOTWITHSTANDING THE FOREGOING, DATAPATH SHALL NOT BE RESPONSIBLE FOR (I) DEFECTS NOT REPORTED BY BUYER, (II) DEFECTS CAUSED BY MISUSE OR ABUSE OF THE PRODUCT, (III) DEFECTS**

CAUSED BY USE OF THE PRODUCT WITH HARDWARE OR SOFTWARE OTHER THAN THAT APPROVED BY DATAPATH FOR USE WITH THE PRODUCT, OR (IV) DEFECTS OCCURRING AFTER UNAUTHORIZED CHANGES HAVE BEEN MADE TO THE PRODUCT, INCLUDING UNAUTHORIZED CHANGES MADE TO THE OBJECT CODE OF THE SOFTWARE. IN ADDITION, DATAPATH SHALL NOT BE RESPONSIBLE FOR REPAIR, REPLACEMENT, OR MAINTENANCE OF PRODUCTS DUE TO DAMAGE CAUSED BY FIRE, WATER, LIGHTNING, POWER SURGE, OTHER CASUALTY, ACTS OF GOD, BUYER OR THE ACT OR OMISSION OF ANY THIRD PARTY.

J. WARRANTY LIMITATIONS AND REMEDIES. BUYER AND OTHERS CLAIMING THROUGH BUYER, WHETHER AS AN ULTIMATE BUYER OR CONSUMER OF PRODUCTS SOLD HEREUNDER, EXPRESSLY WAIVE AND SHALL HAVE NO RIGHT, CLAIM OR CAUSE OF ACTION THAT MAY OTHERWISE ARISE UNDER THE PURCHASE OR USE OF THE PRODUCTS OR SERVICES HEREBY WARRANTED EXCEPT AS EXPRESSLY HEREIN PROVIDED. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, DATAPATH MAKES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER COMMUNICATION. DATAPATH SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE. THE CUMULATIVE LIABILITY OF DATAPATH FOR ALL CLAIMS ARISING UNDER OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE TOTAL AMOUNT OF ALL FEES PAID TO DATAPATH IN THE 12 MONTH PERIOD IMMEDIATELY PRECEDING THE FACT OR CIRCUMSTANCE GIVING RISE TO SUCH LIABILITY. IN NO EVENT WILL DATAPATH BE LIABLE FOR DAMAGES FOR LOSS OF DATA, LOST PROFITS, OR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT, EVEN IF DATAPATH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR FOR ANY CLAIM BY ANY THIRD PARTY. THE FOREGOING LIMITATION OF LIABILITY AND EXCLUSION OF CERTAIN DAMAGES SHALL APPLY REGARDLESS OF THE SUCCESS OR EFFECTIVENESS OF OTHER REMEDIES. BUYER HEREBY WAIVES ANY RIGHT, CLAIM OR CAUSE OF ACTION THAT MIGHT OTHERWISE BE ASSERTED UNDER THIS WARRANTY OR BREACH OR DEFAULT THEREOF BY DATAPATH, ITS SUCCESSORS OR ASSIGNS. ANY PROVISION OF THIS ARTICLE, WHICH IS DEEMED UNCONSCIONABLE BY APPLICABLE LAW, SHALL BE SEVERED AND STRICKEN FROM THIS ARTICLE AND THE REMAINDER OF THE WARRANTY TERMS SHALL BE STRICTLY ENFORCED.

**4. Claims Process Procedures.** The liability of DataPath to service equipment or render services under this warranty is dependent upon the satisfaction of the following conditions in this section:

(1) *Return/Repair Authorization Number.* On discovery of an alleged defect for which a warranty claim may be made, BUYER as claimant hereunder shall promptly notify DataPath of the discovery, the nature of the defect, date, and pertinent details respecting the need for repair or replacement of goods or equipment. DataPath shall promptly review the warranty claim at the request of BUYER and issue instructions and procedures as to disposition of the part to be repaired or replaced. Such instructions will include the issuance of a Return Authorization ("RA") number and destination of the goods or equipment to be returned. In such cases, warranty claims for incidental expenses of freight, insurance and transportation for return of the property will be considered on a case-by-case basis for reimbursement in addition to the determination by DataPath whether defects, abnormal wear and tear, misuse or improper security from mischief or vandalism has caused damage or expense of maintenance the cost for which is outside the scope of warranty coverage. In event the warranty claim is accepted, BUYER shall pay the cost of freight and insurance of the warranted item from to the repair location designated by DataPath. DataPath shall pay the return costs of freight and insurance of the repaired item to BUYER. BUYER shall return the goods or equipment to DataPath or its warranty servicing agent under the RA number.

(2) *Procedures of Spare Issuance from Spares Depot.* DataPath program manager or technical specialist on site shall participate in the decision and review an outage, failure or routine scheduled maintenance requirement for which a warranty claim might be lodged for repair or replacement of failed equipment, spare, component or system. Information shall be exchanged between the BUYER personnel responsible for drawing inventory from the Spares Depot as may be needed to service a warranty claim as approved by the warranty review technician for DataPath located in the SMC. Warranty claims shall not be allowed where BUYER has not followed the instructions and applicable procedures, maintenance, where the affected part or system has been misused, subject of neglect, accident or sabotage, vandalism, or like abuse. Only authorized parts, spares and repairs procedures may be used in servicing a warranty claim under this Agreement and any such work shall be in accordance with DataPath Technical Specifications hereunder and the recommendations of the manufacturer if different from DataPath.

**GENERAL DYNAMICS**
C4 Systems

---

## EXHIBIT B

**Flow-Down Clauses.**
The following Federal Acquisition Regulation (FAR) and Department of Defense FAR Supplement (DFARS) clauses are incorporated herein by reference. The date of the FAR/DFARS clause in effect as of the date of the Prime Contract execution shall apply unless otherwise specified. In all FAR/DFARS clauses below, the term "Seller" shall mean "Seller", the term "Contract" shall mean this Agreement and the terms "Government", "Contracting Officer" and equivalent phrases as used in the FAR/DFARS clauses below mean Buyer and Buyer's Authorized Procurement Representative, respectively. It is intended that the referenced clauses shall apply to Seller in such manner as is necessary to reflect the position of Seller as a Seller to Buyer, to ensure Seller's obligations to Buyer and to the United States Government, and to enable Buyer to meet its obligations under its Prime Contract or Subcontract. The extent and scope of applicability to this contract shall be in accordance with the terms, requirements, guidelines, and limitations stated in each clause. DFARS 227.7202, entitled Commercial Computer Software and Commercial Computer Software Documentation, shall govern the acquisition of Commercial Computer Software.

If the Government Contracting agency is other than the Department of Defense, the applicable clauses of such Contracting agency that supplement the FAR clauses cited below are hereby incorporated by reference, and the DFARS clauses cited below are hereby deemed deleted.

Exceptions to the clauses below are noted as follows:

Note 1 - This clause applies only if the Seller is supplying an item, which is an end product under the Buyer's prime Contract.
Note 2 – "Contracting Officer" means only "U.S. Government Contracting Officer".
Note 3 – "Government" means only "U.S. Government".

**FAR Clauses**

FAR Clauses Applicable to This Order Irrespective of the Amount of the Contract (Exceptions as noted).

| | |
|---|---|
| 52.202-1 | Definitions |
| 52.211-5 | Material Requirements |
| 52.211-15 | Defense Priority and Allocation Requirements |
| 52.216-7 | Allowable Cost and Payment |
| 52.222-1 | Notice to the Government of Labor Disputes |
| 52.223-3 | Hazardous Material Identification and Material Safety Data (Alternate I applies only to Non-DoD Contracts) |
| 52.223-7 | Notice of Radioactive Materials (In paragraph (a), insert "thirty (30)" in the blank.) |
| 52.223-11 | Ozone-Depleting Substances |
| 52.225-1 | Buy American Act – Balance of Payments Program-Supplies (Note 1) |
| 52.225-8 | Duty-Free Entry (If contained in the Buyer's contract) |
| 52.225-15 | Sanctioned European Union Country End Products (Note 1) |
| 52.226-1 | Utilization of Indian Organizations and Indian-Owned Economic Enterprises |
| 52.227-3 | Patent Indemnity |
| 52.227-10 | Filing of Patent Applications - Classified Subject Matter |
| 52.227-11 | Patent Rights - Retention by the Seller (Short Form) (Applicable to Small Businesses only) (Note 3) |
| 52.227-12 | Patent Rights - Retention by the Seller (Long Form) (Note 3) |
| 52.228-5 | Insurance-Work on a Government Installation |
| 52.228-7 | Insurance-Liability to Third Persons |
| 52.232-20 | Limitation of Cost |
| 52.232-22 | Limitation of Funds |
| 52.233-3 | Protest After Award |

GENERAL DYNAMICS
C4 Systems

| | |
|---|---|
| 52.242-15 | Stop-Work Order (Paragraph (b)(2)-change 30 days to 20 days), with Alternate I |
| 52.244-6 | Subcontracts For Commercial Items and Commercial Components |
| 52.245-5 | Government Property |
| 52.246-3 | Inspection of Supplies – Cost-Reimbursement |
| 52.246-5 | Inspection of Services – Cost-Reimbursement |
| 52.249-14 | Excusable Delays |

**FAR Clauses Applicable If This Order Exceeds $2,500.**

| | |
|---|---|
| 52.225-13 | Restrictions on Certain Foreign Purchases |

**FAR Clauses Applicable If This Order Exceeds $10,000.**

| | |
|---|---|
| 52.222-20 | Walsh-Healey Public Contracts Act |
| 52.222-21 | Prohibition of Segregated Facilities |
| 52.222-26 | Equal Opportunity |
| 52.222-35 | Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era and Other Eligible Veterans |
| 52.222-36 | Affirmative Action for Workers with Disabilities |
| 52.222-37 | Employment Reports on Disabled Veterans and Veterans of the Vietnam Era |

**FAR Clauses Applicable If This Order Exceeds $25,000.**

| | |
|---|---|
| 52.225-3 | Buy America Act – North American Free Trade Agreement- Israeli Trade Act |
| 52.225-13 | Restrictions on Certain Foreign Purchases |

**FAR Clauses Applicable If This Order Exceeds $100,000 (Exceptions as noted).**

| | |
|---|---|
| 52.203-6 | Restrictions on Seller Sales to the Government |
| 52.203-7 | Anti-Kickback Procedures |
| 52.203-8 | Cancellation, Rescission and Recovery of Funds for Illegal or Improper Activity |
| 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity |
| 52.203-11 | Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions |
| 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions |
| 52.204-2 | Security Requirements |
| 52.215-2 | Audit and Records – Negotiation (Note 2) |
| 52.215-14 | Integrity of Unit Prices |
| 52.219-8 | Utilization of Small Business Concerns |
| 52.223-6 | Drug Free Workplace |
| 52.223-14 | Toxic Chemical Release Reporting |
| 52.227-1 | Authorization and Consent |
| 52.227-2 | Notice and Assistance Regarding Patent and Copyright Infringement |
| 52.232-17 | Interest |
| 52.242-13 | Bankruptcy |
| 52.244-5 | Competition in Subcontracting |
| 52.246-23 | Limitation of Liability ("Acceptance of supplies delivered under this Contract" shall mean acceptance by the Government under the prime Contract of the supplies delivered hereunder or as incorporated in supplies delivered to Buyer.) |
| 52.246-25 | Limitation of Liability - Services |
| 52.247-63 | Preference for U.S.-Flag Air Carriers |
| 52.247-64 | Preference for Privately Owned U.S.-Flag Commercial Vessels |
| 52.248-1 | Value Engineering |

**FAR Clauses Applicable If This Order Exceeds $500,000.**

| | |
|---|---|
| 52.219-9 | Small Business Subcontracting Plan |

**GENERAL DYNAMICS**
C4 Systems

---

**FAR Clauses Applicable If This Order Exceeds $550,000.**
| | |
|---|---|
| 52.215-10 | Price Reduction for Defective Cost or Pricing Data |
| 52.215-11 | Price Reduction for Defective Cost or Pricing Data – Modifications |
| 52.215-12 | Subcontractor Cost or Pricing Data |
| 52.215-13 | Subcontract Cost or Pricing Data - Modifications |
| 52.215-15 | Pension Adjustments and Asset Reversions |
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other Than Pensions |
| 52.215-19 | Notification of Ownership Changes |
| 52.215-20 | Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data |
| 52.215-21 | Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data – Modifications |

**DFARS Clauses**

**DFARS Clauses Applicable to This Order Irrespective of the Amount of the Order (Exceptions as noted).**
| | |
|---|---|
| 252.204-7000 | Disclosure of Information (In paragraph (b), change "45" days to "60") |
| 252.223-7001 | Hazard Warning Labels |
| 252.223-7006 | Prohibition on Storage and Disposal of Toxic and Hazardous Materials |
| 252.225-7001 | Buy American Act and Balance Of Payments Program |
| 252.225-7002 | Qualifying Country Sources as Sellers |
| 252.225-7009 | Duty-Free Entry-Qualifying Country Supplies |
| 252.225-7010 | Duty-Free Entry-Additional Provisions |
| 252.225-7014 | Preference for Domestic Specialty Metals – Alternate I |
| 252.225-7016 | Restriction on Acquisition of Ball and Roller Bearings |
| 252.225-7036 | Buy American Act – Free Trade Agreement – Balance of Payments Program |
| 252.225-7037 | Duty-Free Entry - Eligible End Products |
| 252.227-7013 | Rights in Technical Data- Noncommercial Items (Note 3) |
| 252.227-7014 | Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation (Note 3) |
| 252.227-7016 | Rights in Bid or Proposal Information |
| 252.227-7017 | Identification and Assertion of Use, Release, or Disclosure Restrictions |
| 252.227-7019 | Validation of Asserted Restrictions - Computer Software |
| 252.227-7025 | Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends |
| 252.227-7027 | Deferred Ordering of Technical Data or Computer Software (Note 3) |
| 252.227-7030 | Technical Data-Withholding of Payment (Note 3) |
| 252.227-7034 | Patents – Subcontracts (Applicable to Small Businesses only) |
| 252.227-7037 | Validation of Restrictive Markings on Technical Data (Note 3) |
| 252.227-7039 | Patents-Reporting of Subject Inventions (Applicable to Small Businesses only) |
| 252.231-7000 | Supplemental Cost Principles |
| 252.235-7003 | Frequency Authorization |
| 252.239-7016 | Telecommunications Security Equipment, Devices, Techniques, and Services |
| 252.243-7001 | Pricing of Contract Modifications |
| 252.245-7001 | Reports of Government Property (In paragraph (a)(3) change Oct. 31 to Sept. 30) |

**DFARS Clauses Applicable If This Order Exceeds $100,000.**
| | |
|---|---|
| 252.203-7001 | Prohibition on Persons Convicted of Fraud or Other Defense-Contract-Related Felonies |
| 252.208-7000 | Intent to Furnish Precious Metals as Government-Furnished Material |
| 252.209-7000 | Acquisition from Sellers Subject to On-Site Inspection Under the Intermediate-Range Nuclear Forces (INF) Treaty |
| 252.225-7025 | Restriction on Acquisition of Forgings |
| 252.226-7001 | Utilization of Indian Organizations and Indian-Owned Economic Enterprise – DOD Contracts |

**GENERAL DYNAMICS**
C4 Systems

---

252.247-7023   Transportation of Supplies by Sea
252.247-7024   Notification of Transportation of Supplies by Sea
252.249-7002   Notification of Proposed Program Termination or Reduction

**DFARS Clauses Applicable If This Order Exceeds $500,000.**
252.219-7003   Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan
252.225-7026   Reporting of Contract Performance Outside the United States

**DFARS Clauses Applicable If This Order Exceeds $550,000.**
252.215-7000   Pricing Adjustments

**DFARS Clauses Applicable If This Order Exceeds $1,000,000.**
252.211-7000   Acquisition Streamlining
Waiver of United Kingdom Levies

In addition, acknowledgment of purchase orders/subcontracts issued as the result of a United States Government prime contract or subcontract shall be in accord with the provisions of the Defense Priorities and Allocations Systems Regulation (15 CFR Part 350) governing rated orders.



April 2, 2007

<u>*VIA EMAIL*</u>

Raymond Fioravanti
Senior Counsel
General Dynamics C4 Systems
400 John Quincy Adams Road
Taunton, MA  02780

RE:    Amendment to Proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B

Dear Mr. Fioravanti:

    I am writing in response to General Dynamics' letter dated 29 March 2007 to amend the proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B.  As you are aware, DataPath disagrees with General Dynamics' position that (a) the current Teaming Agreement between the parties did not commit General Dynamics to purchase all Type 5 and 6 terminals for the Program from DataPath, and (b) such an exclusive purchase arrangement would illegally restrain trade. We have explained why we disagree through our attorney.  To get past that disagreement and enable terminal production to go forward on the scope of work contemplated in a previous Letter Subcontract dated 12 January 2007, DataPath's acceptance of that Letter Subcontract was conditioned on General Dynamics' assent to the following different and additional terms:

    1.    DataPath and General Dynamics agree that formation and performance of the Letter Subcontract and the contemplated firm, fixed-price subcontract will not void the Teaming Agreement and will be without prejudice to the parties' respective positions on their Teaming Agreement obligations concerning General Dynamics' future purchases under the Program; and

    2.    The parties agree to explore alternative methods for expeditiously resolving their disagreement about their respective Teaming Agreement obligations, such as mediation or arbitration.

Raymond Fioravanti, Esq.
April 2, 2007
Page 2 of 2

The same situation presents itself with respect to this amendment to the proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B. DataPath hereby accepts that proposed amendment to the referenced contract, expressly conditioned on General Dynamics' assent to the different and additional terms set forth in items (1) and (2) above. Unless otherwise noted in writing, the acceptance of all future amendments to the referenced subcontract will also be expressly conditioned on General Dynamics' assent to the terms set forth in items (1) and (2) above.

Please advise whether General Dynamics accepts this proposal by signing below and returning a copy to me. If you have any questions, please contact me.

DataPath, Inc.

Jason Wolfersberger
Deputy General Counsel

Accepted and Agreed:

General Dynamics SATCOM Technologies, Inc.

By: Raymond Fioravanti
Its: Senior Counsel

cc:  D. Hall
     K. McCann
     D. Kinney
     D. Helfgott
     J. Modak
     S. Lindeman
     G. Wedick

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

DATAPATH, INC.,            )
                          )
         Plaintiff,       )
                          )      CIVIL ACTION
    vs.                   )
                          )      FILE NO. 07A-07908-2
GENERAL DYNAMICS SATCOM   )
TECHNOLOGIES, INC.,       )
                          )
         Defendant.       )
                          )

**FIRST AMENDED VERIFIED COMPLAINT**

COMES NOW DataPath, Inc. ("DataPath"), Plaintiff herein, and files this First Amended Verified Complaint and shows the Court as follows:

50.     Plaintiff DataPath incorporates herein Paragraph 1 through 49 as set forth in its original Verified Complaint.

51.     Plaintiff amends its Verified Complaint by deleting the existing Exhibit C and replacing it with a more comprehensive and complete Exhibit C, a copy of which is attached hereto and made a part hereof.

**Prayer for Relief**

Plaintiff incorporates herein its Prayer for Relief as set forth in its original Verified Complaint.

This ___14th___ day of September, 2007.

George D. Wenick
Georgia Bar No. 748160
Reginald M. Jones
Georgia Bar No. 403047

*Attorneys for Plaintiff DataPath, Inc.*

**SMITH, CURRIE & HANCOCK LLP**
2700 Marquis One Tower
245 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303-1227
404-521-3800
404-688-0671 (Fax)

-2-

# GENERAL DYNAMICS
C4 Systems

In reply, refer to:
5237 (CA12883)

12 January 2007

VIA E-Mail

DataPath, Inc.
2450 Satellite Boulevard
Duluth, GA 30096-5901

Attention:   Mr. David J. Hall
             Vice President, Contracts

Subject:     Letter Subcontract No. SATCOM-2007-01-11

Reference:   (a)     SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002

Dear Mr. Hall,

General Dynamics SATCOM Technologies, Inc. (SATCOM) authorizes DataPath, Inc. (DataPath) to furnish to SATCOM the supplies and services described below:

> Qty. 10 – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System, and O&M Manuals.  $402,161.00 each
>
> Qty. 10 – JNN Lot 9 STT complete Spares Kits.  $148,285.00 each
>
> Delivery Schedule for STTs and Kits:
> Qty. 1:  15 MAR 2007 or sooner
> Balance:  Qty. 1 per week thereafter

DataPath is not authorized to make expenditures or incur obligations hereunder that exceed $5,504,460.00.  A firm fixed price type definitive contract referencing the same subject letter subcontract number (with a negotiated price in no event to exceed $5,504,460.00) is contemplated to supersede this Letter Subcontract.  The governing terms and conditions are to be negotiated based upon the draft subcontract no. SATCOM-SWAN-07-01 provided to DataPath via e-mail on 05 JAN 2007.  This Letter Subcontract is a DOA7 rated order under DPAS.

This Letter Subcontract and the proposed terms and conditions do not contain any obligations beyond those mentioned above.  As discussed by the Parties on 10 JAN 2007, SATCOM considers any obligation that requires exclusive procurement of terminals from DataPath for

4825 River Green Parkway
Duluth, GA 30096
Tel:  770 497 8300
Fax: 770 476 7092
www.gdsatcom.com

**EXHIBIT C**

1

12 JAN 2007
Page 2

World Wide Satellite Systems (WWSS)  Requests for Task Execution Plans (RTEPs) to be an improper restraint of trade that would trigger reporting requirements.

Please provide your written confirmation and acceptance of this Letter Subcontract by close of business Monday, 15 JAN 2007.  SATCOM looks forward to completing negotiations for the above mentioned goods and services.  Please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

General Dynamics
SATCOM Technologies

William K. Clark, Jr.
Director of Contracts
Programs, Duluth Facility

cc:   M. Shoemake
      C. Buck
      R. Fioravanti
      M. Ghanouni
      R. Morefield

2

 

January 18, 2007

***VIA FACSIMILE AND REGULAR MAIL***

Raymond Fioravanti
Senior Counsel
General Dynamics C4 Systems
400 John Quincy Adams Road
Taunton, MA  02780

RE.   Proposed Letter Subcontract Dated 12 January 2007

Dear Mr. Fioravanti:

I am writing in response to General Dynamics' proposed Letter Subcontract dated 12 January 2007.  In connection with that Letter Subcontract, you have explained General Dynamics' position that (a) the current Teaming Agreement between the parties did not commit General Dynamics to purchase all Type 5 and 6 terminals for the Program from DataPath, and (b) such an exclusive purchase arrangement would illegally restrain trade.  We have responded to your letter, through our attorney, and explained why we disagree.  To get past our current disagreement and enable terminal production to go forward on the current scope of work, DataPath hereby accepts the proposed Letter Subcontract, expressly conditioned on General Dynamics' assent to the following different and additional terms:

1.   DataPath and General Dynamics agree that formation and performance of the Letter Subcontract and the contemplated firm, fixed-price subcontract will not void the Teaming Agreement and will be without prejudice to the parties' respective positions on their Teaming Agreement obligations concerning General Dynamics' future purchases under the Program; and

2   The parties agree to explore alternative methods for expeditiously resolving their disagreement about their respective Teaming Agreement obligations, such as mediation or arbitration.

3

# DATA**P**ATH

Raymond Fioravanti. Esq.
January 18, 2007
    Page 2 of 2

      Please advise whether General Dynamics accepts this proposal by signing below and
returning a copy to me.  If you have any questions, please contact me.

                    DataPath, Inc.

                    Steven R. Wilson
                    VP and General Counsel

Accepted and Agreed:

General Dynamics SATCOM Technologies, Inc.

By: Raymond Fioravanti
Its: Senior Counsel


cc:    D. Hall
       D. Kinney
       D. Helfgott
       J. Modak
       S. Lindeman
       G. Wenick

4

# GENERAL DYNAMICS
C4 Systems

In reply, refer to:
5237 (CA12892)

02 March 2007

VIA E-Mail

DataPath, Inc.
2450 Satellite Boulevard
Duluth, GA 30096-5801

Attention:    Mr. Kevin McCann
              Sr. Contract Administrator

Subject:      Letter Subcontract No. SATCOM-2007-01-11 Rev. A

Reference:    (a)    SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002

Dear Mr. McCann,

General Dynamics SATCOM Technologies, Inc. (SATCOM) amends the subject Letter
Subcontract to add the CX11230 Triax Connector Interface to Qty. 10 Lot 9 STTs.

The supplies and services covered by Letter Subcontract No. SATCOM-2007-01-11 Rev. A are
described below:

    Qty. 10 – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor
    and Control System, and O&M Manuals.  $402,161.00 each

    Qty. 10 - CX11230 Triax Connector Interface.  $26,606.00 each

    Qty. 10 – JNN Lot 9 STT complete Spares Kits.  $148,285.00 each

    Delivery Schedule for STTs and Kits:
        Qty. 1:  15 MAR 2007 or sooner
        Balance:  Qty. 1 per week thereafter

DataPath is not authorized to make expenditures or incur obligations hereunder that exceed
$5,769,520.00.  A firm fixed price type definitive contract referencing the same subject letter
subcontract number (with a negotiated price in no event to exceed $5,769,520.00) is
contemplated to supersede this Letter Subcontract.  The governing terms and conditions are to
be negotiated based upon the draft subcontract no. SATCOM-SWAN-07-01 provided to DataPath
via e-mail on 05 JAN 2007.  This Letter Subcontract is a DOA7 rated order under DPAS.

4825 River Green Parkway
Duluth, GA 30096
Tel:  770 497 8600
Fax:  770 476 7092
www.gdsatcom.com



02 MAR 2007
Page 2

Please provide your written confirmation and acceptance of this amended Letter Subcontract by close of business Monday, 05 MAR 2007.  Please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

General Dynamics
SATCOM Technologies

William K. Clark, Jr.
Director of Contracts
Programs, Duluth Facility

cc:   M. Shoemake
      C. Buck
      R. Fioravanti
      M. Ghancurri
      R. Morefield



**DATA PATH**

855 Stadium Boulevard
N/A Inc.
Atlanta, GA 30329-2250
Tel 678.385.2400
www.datapath.com

March 7, 2007

*VIA FACSIMILE AND REGULAR MAIL*

Raymond Fioravanti
Senior Counsel
General Dynamics C4 Systems
400 John Quincy Adams Road
Taunton, MA 02780

RE:    Proposed Letter Subcontract Dated 2 March 2007

Dear Mr. Fioravanti:

I am writing in response to General Dynamics' proposed Letter Subcontract dated 2 March 2007. As you are aware, DataPath disagrees with General Dynamics' position that (a) the overall Teaming Agreement between the parties did not commit General Dynamics to purchase all Type 5 and 6 terminals for the Program from DataPath, and (b) such an exclusive purchase arrangement would illegally restrain trade.   We have explained why we disagree through our attorney. To get past that disagreement and enable potential production to go forward on the scope of work contemplated in a previous Letter Subcontract dated 12 January 2007, DataPath's acceptance of that Letter Subcontract was conditioned on General Dynamics' assent to the following different and additional terms:

1.    DataPath and General Dynamics agree that formation and performance of the Letter Subcontract and the contemplated firm, fixed-price subcontract will not void the Teaming Agreement and will be without prejudice to the parties' respective positions on their Teaming Agreement obligations concerning General Dynamics' future purchases under the Program; and

2.    The parties agree to explore alternative methods for expeditiously resolving their disagreement about their respective Teaming Agreement obligations, such as mediation or arbitration.

Raymond Fioravanti, Esq.
March 7, 2007
Page 2 of 2

The same situation presents itself with respect to the proposed Letter Subcontract Dated 2 March 2007. DataPath hereby accepts that proposed Letter Subcontract, expressly conditioned on General Dynamics' assent to the different and additional terms set forth in items (1) and (2) above.

Please advise whether General Dynamics accepts this proposal by signing below and returning a copy to me. If you have any questions, please contact me.

DataPath, Inc.

[signature]

Steven E. Wilton
VP and General Counsel

Accepted and Agreed:

General Dynamics

By:

Its: For General Dynamics SATCOM Technologies, Inc.

cc:  D. Hall
     D. Klancy
     D. Hadgon
     J. Modak
     S. Lindeman
     G. Wenick

# GENERAL DYNAMICS
C4 Systems

In reply, refer to:
W002 (CA12904)

21 March 2007

VIA E-Mail

DataPath, Inc.
2450 Satellite Boulevard
Duluth, GA 30096-5801

Attention:    Mr. Kevin McCann
              Sr. Contract Administrator

Subject:      Letter Subcontract No. SATCOM-2007-01-11 Rev. B

Reference:    (a)    SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002
              (b)    SATCOM Letter CA12692 Dated 02 MAR 2007

Dear Mr. McCann,

General Dynamics SATCOM Technologies, Inc. (SATCOM) amends the subject Letter
Subcontract to correct the CX11230 Triax Connector Interface funding amount for the Qty. 10 Lot
9 STTs.

The supplies and services covered by Letter Subcontract No. SATCOM-2007-01-11 Rev. B are
described below:

        Qty. 10 – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor
        and Control System, and O&M Manuals. $402,161.00 each

        Qty. 10 - CX11230 Triax Connector Interface. $2,650.60 each

        Qty. 10 – JNN Lot 9 STT complete Spares Kits. $148,265.00 each

        Delivery Schedule for STTs and Kits:
              Qty. 1:  15 MAR 2007 or sooner
              Balance:  Qty. 1 per week thereafter

DataPath is not authorized to make expenditures or incur obligations hereunder that exceed
$5,530,966.00. A firm fixed price type definitive contract referencing the same subject letter
subcontract number (with a negotiated price in no event to exceed $5,530,966.00) is
contemplated to supersede this Letter Subcontract. The governing terms and conditions are to

4825 River Green Parkway
Duluth, GA 30096
Tel: 770 497 8300
Fax: 770 476 7092
www.gdsatcom.com



9

21 MAR 2007
Page 2


be negotiated based upon draft subcontract no. SATCOM-SWAN-07-01 provided to DataPath via
e-mail on 05 JAN 2007 or former subcontract C4S-K023-04-001 provided to DataPath via e-mail
02 MAR 2007.  This Letter Subcontract is a DOA7 rated order under DPAS.

Please provide your written confirmation and acceptance of this amended Letter Subcontract by
close of business Friday, 23 MAR 2007.  Please do not hesitate to contact the undersigned if you
have any questions.

Sincerely,

General Dynamics
SATCOM Technologies

William K. Clark, Jr.
Director of Contracts
Programs, Duluth Facility


cc:    M. Shoemake
       C. Buck
       R. Fioravanti
       M. Ghanouni
       R. Morefield

10

# DATA)ATH



March 26, 2007

**_VIA FACSIMILE AND REGULAR MAIL_**

Raymond Facewell
Senior General
General Dynamics C4 Systems
400 John Quincy Adams Road
Taunton, MA 02780

RE:    Amendment to Proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B

Dear Mr. Facewell:

I am writing in response to General Dynamics' letter dated 21 March 2007 to amend the proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B. As you are aware, DataPath disagrees with General Dynamics' position that (a) the current Teaming Agreement between the parties did not commit General Dynamics to purchase all Type 5 and 6 terminals for the Program from DataPath, and (b) such an exclusive purchase arrangement would illegally restrain trade. We have explained why we disagree on these issues. To get past that disagreement and enable trial production to go forward on the scope of work contemplated in a previous Letter Subcontract dated 12 January 2007, DataPath's acceptance of that Letter Subcontract was conditioned on General Dynamics' assent to the following different and additional terms:

1. DataPath and General Dynamics agree that formation and performance of the Letter Subcontract and the contemplated firm, fixed-price subcontract will not void the Teaming Agreement and will be without prejudice to the parties' respective positions on their Teaming Agreement obligations concerning General Dynamics' future purchases under the Program; and

2. The parties agree to explore alternative methods for expeditiously resolving their disagreement about their respective Teaming Agreement obligations, such as mediation or arbitration.

11

Raymond Fierravanti, Esq.
March 26, 2007
Page 2 of 2

The same situation presents itself with respect to the amendment to the proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B. DataPath hereby accepts that proposed Letter Subcontract, expressly conditioned on General Dynamics' assent to the different and additional terms set forth in Items (1) and (2) above.

Please advise whether General Dynamics accepts this proposal by signing below and returning a copy to me. If you have any questions, please contact me.

DataPath, Inc.

Aaron Wohlfarger
Deputy General Counsel

Accepted and Agreed:

General Dynamics

By: Raymond Fierravanti
Its: VP General Dynamics SATCOM Technologies, Inc.

cc:   D. Hall
K. McCann
D. Kinney
D. Holtgott
J. Modek
B. Lindemann
G. Wenick

12

# GENERAL DYNAMICS
C4 Systems

In reply, refer to:
W002 (CA12906) (Rev. A)

29 March 2007

VIA E-Mail

DataPath, Inc.
2450 Satellite Boulevard
Duluth, GA 30096-5801

Attention:    Mr. Kevin McCann
              Sr. Contract Administrator

Subject:      Letter Subcontract No. SATCOM-2007-01-11 Rev. C

Reference:    (a)    SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002
              (b)    SATCOM Letter CA12904 Dated 21 MAR 2007

Dear Mr. McCann,

General Dynamics SATCOM Technologies, Inc. (SATCOM) amends the subject Letter Subcontract to provide DataPath instruction concerning acceptance, shipment, and invoicing of the Qty. 10 Lot 9 STTs and their corresponding Spares Kits.

The supplies and services covered by Letter Subcontract No. SATCOM-2007-01-11 Rev. C are described below:

Qty. 10 – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System, and O&M Manuals.  $402,161.00 each

Qty. 10 - CX11230 Triax Connector Interface.  $2,650.60 each

Qty. 10 – JNN Lot 9 STT complete Spares Kits.  $148,285.00 each

VertexRSI
ISO 9001 Registered

13

29 MAR 2007
Page 2

SATCOM authorizes DataPath to ship qty. 1 immediately of each item above to:

    General Dynamics SATCOM Technologies
    4825 River Green Parkway
    Duluth, Georgia 30096

SATCOM further authorizes DataPath to ship-in-place immediately qty. 2 of each item above. DataPath to advise SATCOM of any storage charges, etc.

SATCOM shall provide within 7 days a revised delivery schedule (Ex Works INCOTERMS 2000) for the qty. 10 STTs and Kits.

DataPath shall send an invoice for qty. 3 STTs and Kits to:

    General Dynamics SATCOM Technologies
    Attn: Accounts Payable
    4825 River Green Parkway
    Duluth, Georgia 30096

After inspection and Acceptance by SATCOM at (i) DataPath's facility for the qty. 2 shipped-in-place units and (ii) SATCOM's Duluth Facility for the qty. 1 unit, SATCOM shall pay the invoice net 30 from the date of invoice. Payment shall be made via bank-wire transfer, free of any charges whatsoever in favor of DataPath, Inc., without set-off or counter-claim, to the DataPath Inc. account listed below:

    RBC Centura Bank
    Rocky Mount, NC 27802
    ABA 053-100-850
    Account 614-000-3956

DataPath is not authorized to make expenditures or incur obligations hereunder that exceed $5,530,966.00. A firm fixed price type definitive contract referencing the same subject letter subcontract number (with a negotiated price in no event to exceed $5,530,966.00) is contemplated to supersede this Letter Subcontract. The governing terms and conditions are to be negotiated based upon draft subcontract no. SATCOM-SWAN-07-01 provided to DataPath via e-mail on 05 JAN 2007 or former subcontract C4S-K023-04-001 provided to DataPath via e-mail 02 MAR 2007. This Letter Subcontract is a DOA7 rated order under DPAS.

14

29 MAR 2007
Page 3

Please provide your written confirmation and acceptance of this amended Letter Subcontract by close of business Friday, 30 MAR 2007.  Please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

General Dynamics
SATCOM Technologies

William K. Clark, Jr.
Director of Contracts
Programs, Duluth Facility

cc:  M. Shoemake
     C. Buck
     R. Fioravanti
     M. Ghanouni
     R. Morefield

15



DATA PATH

April 2, 2007

**VIA EMAIL**

Raymond Fioravanti
Senior Counsel
General Dynamics C4 Systems
400 John Quincy Adams Road
Taunton, MA 02780

RE:   Amendment to Proposed Letter Subcontract No. SATCO&4-2007-01-11 Rev. B

Dear Mr. Fiorvanti:

I am writing in response to General Dynamics' letter dated 29 March 2007 to amend the proposed Letter Subcontract No. SATCO&4-2007-01-11 Rev. B.  As you are aware, DataPath disagrees with General Dynamics' position that (a) the current Teaming Agreement between the parties did not commit General Dynamics to purchase all Type 5 and 6 terminals for the Program from DataPath, and (b) such an exclusive premise arrangement would illegally restrain trade. We have explained why we disagree through our attorney.  To get past that disagreement and enable terminal production to go forward on the same scope of work contemplated in a previous Letter Subcontract dated 12 January 2007, DataPath's acceptance of the Letter Subcontract was constitioned on General Dynamics' assent to the following different and additional terms:

1.   DataPath and General Dynamics agree that formation and performance of the Letter Subcontract and the contemplated firm, fixed-price subcontract will not void the Teaming Agreement and will be without prejudice to the parties' respective positions on their Teaming Agreement obligations concerning General Dynamics' future purchases under the Program; and

2.   The parties agree to explore alternative methods for expeditiously resolving their disagreement about their respective Teaming Agreement obligations, such as mediation or arbitration.

16

Raymond Fierravanti, Esq.
April 2, 2007
Page 2 of 2

The same situation presents itself with respect to this amendment to the proposed Letter Subcontract No. SATCOM-2007-01-11 Rev. B. DataPath hereby accepts that proposed amendment to this referenced contract, expressly conditioned on General Dynamics' assent to the different and additional terms set forth in items (1) and (2) above. Unless otherwise noted in writing, the acceptance of all future amendments to the referenced subcontract will also be expressly conditioned on General Dynamics' assent to the terms set forth in items (1) and (2) above.

*Please advise whether General Dynamics accepts this proposal by signing below and returning a copy to me. If you have any questions, please contact me.*

DataPath, Inc.

Jason Wolkenberge
Deputy General Counsel

Accepted and Agreed:

General Dynamics SATCOM Technologies, Inc.

By: Raymond Fierravanti
Its: Senior Counsel

cc    D. Hall
      K. McClure
      D. Kinney
      D. Helfgot
      J. Modzi
      S. Linderman
      Q. Weikt

17

# GENERAL DYNAMICS
SATCOM Technologies

In reply, refer to:
W002 (CA123322) (Rev. 2)

22 June 2007

VIA E-Mail

DataPath, Inc.
2480 Satellite Boulevard
Duluth, GA 30096-5801

Attention:  Mr. Kevin McCann
            Sr. Contract Administrator

Subject:    Letter Subcontract No. SATCOM-2007-01-11 Rev. D

Reference:  (a)  SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002, Support Wide Area Network (SWAN)
            (b)  SATCOM Letter CA12006 Dated 29 MAR 2007

Enclosure:  (1)  Exhibit A – Warranty and Warranty Service
            (2)  Exhibit B – Flow-Down Clauses

Dear Mr. McCann,

General Dynamics SATCOM Technologies, Inc. (SATCOM) amends the subject Letter Subcontract based solely upon the referenced (a) delivery order to (i) exercise an option of an additional qty. 15 Satellite Transportable Terminals (STTs) and qty. 10 STT spares kits, (ii) include additional optional quantities, and (iii) detail the respective terms and conditions.

The supplies and services covered by the previous Letter Subcontract No. SATCOM-2007-01-11 Rev. C are described below:

Qty. 10 – ANVTSC-167B (V) 1 (ANN) – JNN Lot 8 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, "BackView" Installation for Lot 8" Monitor and Control System (which consists of TMCamm 6.4.13.3; Broker 3.1.13.0; Logger 2.2.3.0; Whisper 3.1.0; GUI Server 5.3.3.0; Utility Server 6.0.A.0; and Aperia 6.3.6.1) and O&M Manuals. $402,751.00 each

Qty. 10 – CX11230 Triax Connector Interface. $2,860.00 each

Qty. 10 – ANVTSC-167B (V) 1 (ANN) – JNN Lot 9 STT Spares Kit. $148,286.00 each

NOTE: In order to cover the discount for the initial qty. 10 STT and qty. 10 STT spares units ordered under Letter Subcontract No. SATCOM-2007-01-11 Rev. C, an additional $7,500.00 credit shall be applied to each of the next qty. 40 STTs and $1,250.00 credit shall be applied to each of the next qty. 40 STT spares kits. Thus, the resulting unit price for the qty. 15 STTs under Rev. D above is $397,211.50 ($374,611.50 less $7,500.00) and qty. 10 STT spares kits under Rev. D above is $142,035.00 ($143,285.00 less $1,250.00).

4825 River Green Parkway
Duluth, Georgia 30096
Tel: 770 497 5800
Fax: 770 476 7053
www.gdsatcom.com

22 JUN 2007
Page 2

The supplies and services covered by this Letter Subcontract No. SATCOM-2007-01-11 Rev. D are
described below:

Qty. 15 – AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50
GHz, "MaxView Installation for Lot 9" Monitor and Control System (which consists of TMComm
1.4.13.3; Broker 3.1.13.0; Logger 2.2.5.0; Wrapper 3.1.0; GUI Server 5.3.5.0; Utility Server
6.0.4.0; and Aperio 5.3.5.1), CX11230 Triax Connector Interface, and O&M Manuals.
$367,311.80 each [$372,161.00, plus $2,650.80 for the CX11230 modification, less the $7,500.00
credit per STT]

Qty. 10 – AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT Spares Kits.  $142,035.00 each
[$143,285.00 less $1,250.00 credit per STT spares kit]

OPTIONS for the referenced (s) delivery order:

OPTION FOR INCREASED QUANTITIES:  SATCOM may increase the quantity of supplies called
for in the schedule below at the unit price specified solely in satisfaction of orders placed by the
U.S. Government under Contract No. W15P7T-06-D-L219, Delivery Order 0002 ["Support Wide
Area Network (SWAN)"].  Both SATCOM and DataPath, Inc. (DataPath) shall agree on the
delivery schedule for any of the options exercised below.

OPTION PRICING:

AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50
GHz, "MaxView Installation for Lot 9" Monitor and Control System (which consists of
TMComm 1.4.13.3; Broker 3.1.13.0; Logger 2.2.5.0; Wrapper 3.1.0; GUI Server 5.3.5.0;
Utility Server 6.0.4.0; and Aperio 5.3.5.1), CX11230 Triax Connector Interface, and O&M
Manuals.  Quantities 1 – 25, $367,311.80 each

AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50
GHz, Lot 9 Monitor and Control System, CX11230 Triax Connector Interface, and O&M
Manuals.  Quantities 26+, $374,811.80 each

AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT Spares Kit.  Quantities 1 – 30, $142,035.00
each

AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT Spares Kit.  Quantities 31+, $143,285.00
each

NOTE:  Option pricing is valid from 13 JUN 2007 to 20 DEC 2010, and does not include
the quantities purchased prior to or exercised by this Letter Subcontract No. SATCOM-
2007-01-11 Rev. D, which are qty. 25 AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STTs, and
Qty. 20 AN/TSC-167B (V) 1 (JNN) – JNN Lot 9 STT Spares Kits.

Conditions upon which the above credit and option pricing are based:

- DataPath shall be the exclusive provider of the STT under Contract No. W15P7T-06-D-
  L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"] or any amendment
  under Delivery Order 0002.

- SATCOM shall not promote its version of the STT under Contract No. W15P7T-06-D-
  L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"] or any amendment
  under Delivery Order 0002.

19

20

**22 JUN 2007**
**Page 3**

DataPath shall deliver the qty. 16 STTs and 10 Spares Kits per the following schedule:

Qty. 2 STTs/Qty 2 Spares Kits – deliver 30 JUN 2007
Qty. 6 STTs/Qty 6 Spares Kits – deliver 30 AUG 2007
Qty. 7 STTs/Qty 2 Spares Kits – deliver 30 OCT 2007

NOTE: DataPath is allowed to deliver the current additional qty. 16 STTs and qty. 10 Spares Kits before 30 JUN 2007. On 28 JUN 2007, SATCOM shall inspect and accept any STTs and Spares Kits that are available at DataPath's facility. For any STTs or Spares Kits that are available after 28 JUN 2007, SATCOM shall inspect and accept within ten (10) calendar days after written notification.

DataPath shall pay to SATCOM's SGcom Facility an additional $5,000.00 per antenna subsystem (not including the qty. 10 antenna subsystems for the initial qty. 10 STTs under this Letter Subcontract) for future orders directly related to SATCOM's prime Contract No. W15P7T-06-D-L219, Delivery Order 0002 ("Support Wide Area Network (SWAN)"). The additional per antenna amount will directly correlate to the quantity exercised by SATCOM (example: qty. 15 STTs exercised in the delivery order, therefore $75,000 additional payment from DataPath to SATCOM will be made for those antenna products). If for some reason DataPath purchases a lesser quantity of antenna subsystems than will still be applied to the quantity order, then the $5,000 payment per antenna subsystem will still be applied to the quantity exercised by SATCOM and not the quantity purchased by DataPath.

DataPath shall be the exclusive provider of Field Service Representatives (FSRs) for Contract No. W15P7T-06-D-L219, Delivery Order 0002 "Support Wide Area Network (SWAN)") or any amendment under Delivery Order 0002 (Iraq and Horn of Africa only), provided the FSR options are exercised by the Government, and DataPath and SATCOM negotiate a mutually agreed upon price for Horn of Africa and Iraq.

DataPath shall not charge any storage fees or the like, for storage of STTs or STT spares kits shipped in place at DataPath, for a period of 12 months, commencing on the acceptance date of said STTs or STT spares kits.

**Additional terms and conditions:**

Terms and conditions of this Letter Subcontract take precedence over the terms and conditions on the reverse side of any purchase order issued by SATCOM under the SWAN program.

DataPath's standard 1-year warranty and warranty service (see Exhibit A) shall apply (reference e-mail to B. Clark from D. Hall at 3:29PM on 27 APR 2007).

DataPath and SATCOM agree to negotiate in good faith data rights in accordance with applicable FAR/DFAR clauses mentioned below for technical data delivered and to be delivered under Contract No. W15P7T-06-D-L219, Delivery Order 0002 ("Support Wide Area Network (SWAN)").

The FAR/DFAR flow downs (see Exhibit B), except as modified by this Letter Subcontract, shall apply. For the avoidance of doubt, as Note 3 clearly states in Exhibit B, DataPath will be dealing directly with the US Government concerning any Data Rights clause and no Data Rights have been transferred or will transfer, directly or indirectly to SATCOM.

21

22 JUN 2007
Page 4
SATCOM authorizes DataPath to ship [Ex-Works INCOTERMS 2000] each ordered item above to:

General Dynamics SATCOM Technologies
4825 River Green Parkway
Duluth, Georgia 30096

DataPath shall send Invoices to:

General Dynamics SATCOM Technologies
Attn: Accounts Payable
4825 River Green Parkway
Duluth, Georgia 30096

After Inspection and Acceptance by SATCOM at either (i) DataPath's facility for any shipped-in-place units or (ii) SATCOM's Duluth Facility, SATCOM shall pay the Invoice not 30 from the date of Invoice. Payment shall be made via check.

Letter Subcontract No. SATCOM-2007-01-11 Rev. D authorizes DataPath to make additional expenditures of $4,950,024.00 for the qty. 15 BTT's and qty. 10 Spares kits detailed above. In total, DataPath is not authorized to make expenditures or incur obligations hereunder that exceed $12,460,600.00. A firm fixed price type definitive purchase order no. 2065696 is contemplated to incorporate this Letter Subcontract. This Letter Subcontract is a DO-A7 rated order under DPAS.

DataPath's acceptance of this amended Letter Subcontract is expressly contingent [on SATCOM's assent to the terms and conditions of the letter agreement between SATCOM and DataPath dated 02 APR 2007 sent from J. Wolfersberger to R. Florment]. SATCOM's execution of this Letter Subcontract constitutes such assent.

Please provide your written confirmation and acceptance of this amended Letter Subcontract by close of business 25 JUN 2007. Please do not hesitate to contact the undersigned if you have any questions. .

Sincerely,

General Dynamics
SATCOM Technologies

William K Clark, Jr.
Director of Contracts
Programs, Duluth Facility

Accepted and Agreed:
DataPath, Inc.

By:
Title:          CFO

cc:     M. Bhatmikia
        C. Burk
        R. Florment
        M. Giancurzi
        R. Mardlid

22

**EXHIBIT A**

**WARRANTY AND WARRANTY SERVICE**

1. Manufacturer's Warranty. Where a company other than DataPath manufactures components, accessories or systems, DataPath shall assign to BUYER its right, title and interest in and to any such equipment warranties, which it may receive as the initial purchaser of the equipment, component, system or accessories. Where an instrument of assignment is appropriate, DataPath shall prepare and execute such assignment to BUYER as may be required under the Agreement.

2. DATAPATH WARRANTY. EXCEPT AS OTHERWISE PROVIDED IN THE AGREEMENT RESPECTING THE SOFTWARE LICENSE AGREEMENT AND THE SOFTWARE MAINTENANCE AGREEMENT ATTACHED HERETO, DATAPATH WARRANTS THE PRODUCTS SOLD UNDER THIS AGREEMENT SHALL BE FREE FROM MATERIAL DEFECTS CAUSED BY FAULTY MATERIAL, OR POOR WORKMANSHIP AND SHALL FUNCTION SUBSTANTIALLY IN ACCORDANCE WITH THE TECHNICAL SPECIFICATION AS ESTABLISHED UNDER THE STATEMENT OF WORK EXCLUDING SERVICES, WHICH ARE WARRANTED ONLY FOR 90 DAYS. THE TERM OF THE DATAPATH WARRANTY SHALL BE 12 MONTHS FROM THE DATE OF DELIVERY OF THE PRODUCT, OR BUYER ACCEPTANCE, WHICHEVER OCCURS FIRST. THE SOLE LIABILITY OF DATAPATH UNDER THIS WARRANTY IS LIMITED TO ITS OBLIGATION TO REPAIR OR REPLACE THE PRODUCTS OR RE-PERFORM THE SERVICES THAT ARE DETERMINED AT THE SOLE OPTION AND DISCRETION OF DATAPATH TO BE DEFECTIVE. IF BUYER DOES NOT AGREE WITH DATAPATH'S DETERMINATION, AT BUYER'S EXPENSE, BUYER SHALL BE AUTHORIZED TO HIRE A THIRD PARTY TO MAKE AN INDEPENDENT ASSESSMENT OF DATAPATH'S DETERMINATION. IF THE THIRD PARTY DETERMINES THAT DATAPATH BREACHED THE WARRANTY, DATAPATH MAY REPAIR OR REPLACE ANY SUCH DEFECTIVE PRODUCTS OR RE-PERFORM THE SERVICES, OR CREDIT THE ACCOUNT OF BUYER, WITH THE AMOUNT OF THE PURCHASE PRICE FOR SUCH DEFECTIVE PRODUCTS OR SERVICES. THE WARRANTIES EXPRESSED HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED AND OF ALL OTHER OBLIGATIONS OR LIABILITIES ON THE PART OF DATAPATH. BUYER SHALL NOT BE AUTHORIZED OR PERMITTED TO EXTEND THE TERMS OR CONDITIONS OF THIS WARRANTY. NOTWITHSTANDING THE FOREGOING, DATAPATH SHALL NOT BE RESPONSIBLE FOR (I) DEFECTS NOT REPORTED BY BUYER, (II) DEFECTS CAUSED BY MISUSE OR ABUSE OF THE PRODUCT, (III) DEFECTS

CAUSED BY USE OF THE PRODUCT WITH HARDWARE OR SOFTWARE OTHER THAN THAT APPROVED BY DATAPATH FOR USE WITH THE PRODUCT, OR (IV) DEFECTS OCCURRING AFTER UNAUTHORIZED CHANGES HAVE BEEN MADE TO THE PRODUCT, INCLUDING UNAUTHORIZED CHANGES MADE TO THE OBJECT CODE OF THE SOFTWARE. IN ADDITION, DATAPATH SHALL NOT BE RESPONSIBLE FOR REPAIR, REPLACEMENT, OR MAINTENANCE OF PRODUCTS DUE TO DAMAGE CAUSED BY FIRE, WATER, LIGHTNING, POWER SURGE, OTHER CASUALTY, ACTS OF GOD, BUYER OR THE ACT OR OMISSION OF ANY THIRD PARTY.

3. WARRANTY LIMITATIONS AND REMEDIES. BUYER AND OTHERS CLAIMING THROUGH BUYER, WHETHER AS AN ULTIMATE BUYER OR CONSUMER OF PRODUCTS SOLD HEREUNDER, EXPRESSLY WAIVE AND SHALL HAVE NO RIGHT, CLAIM OR CAUSE OF ACTION THAT MAY OTHERWISE ARISE UNDER THE PURCHASE OR USE OF THE PRODUCTS OR SERVICES HEREBY WARRANTED EXCEPT AS EXPRESSLY HEREIN PROVIDED. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, DATAPATH MAKES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER COMMUNICATION. DATAPATH SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE. THE CUMULATIVE LIABILITY OF DATAPATH FOR ALL CLAIMS ARISING UNDER OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE TOTAL AMOUNT OF ALL FEES PAID TO DATAPATH IN THE 12 MONTH PERIOD IMMEDIATELY PRECEDING THE FACT OR CIRCUMSTANCE GIVING RISE TO SUCH LIABILITY. IN NO EVENT WILL DATAPATH BE LIABLE FOR DAMAGES FOR LOSS OF DATA, LOST PROFITS, OR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT, EVEN IF DATAPATH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR FOR ANY CLAIM BY ANY THIRD PARTY. THE FOREGOING LIMITATION OF LIABILITY AND EXCLUSION OF CERTAIN DAMAGES SHALL APPLY REGARDLESS OF THE SUCCESS OR EFFECTIVENESS OF OTHER REMEDIES. BUYER HEREBY WAIVES ANY RIGHT, CLAIM OR CAUSE OF ACTION THAT MIGHT OTHERWISE BE ASSERTED UNDER THIS WARRANTY OR BREACH OR DEFAULT THEREOF BY DATAPATH, ITS SUCCESSORS OR ASSIGNS. ANY PROVISION OF THIS ARTICLE, WHICH IS DEEMED UNCONSCIONABLE BY APPLICABLE LAW, SHALL BE SEVERED AND STRICKEN FROM THIS ARTICLE AND THE REMAINDER OF THE WARRANTY TERMS SHALL BE STRICTLY ENFORCED.

23

**4. Claims Process Procedures.** The liability of DataPath to service equipment or render services under this warranty is dependent upon the satisfaction of the following conditions in this section:

(1) *Return/Repair Authorization Number.* On discovery of an alleged defect for which a warranty claim may be made, BUYER as claimant hereunder shall promptly notify DataPath of the discovery, the nature of the defect, date, and pertinent details respecting the need for repair or replacement of goods or equipment. DataPath shall promptly review the warranty claim at the request of BUYER and issue instructions and procedures as to disposition of the part to be repaired or replaced. Such instructions will include the issuance of a Return Authorization ("RA") number and destination of the goods or equipment to be returned. In such cases, warranty claims for incidental expenses of freight, insurance and transportation for return of the property will be considered on a case-by-case basis for reimbursement in addition to the determination by DataPath whether defects, abnormal wear and tear, misuse or improper security from mishandling or vandalism has caused damage or expense of maintenance the cost for which is outside the scope of warranty coverage. In event the warranty claim is accepted, BUYER shall pay the cost of freight and insurance of the warranted item from to the repair location designated by DataPath. DataPath shall pay the return costs of freight and insurance of the repaired item to BUYER. BUYER shall return the goods or equipment to DataPath or its warranty servicing agent under the RA number.

(2) *Procedures of Spare Issuance from Spare Depot.* DataPath program manager or technical specialist on site shall participate in the decision and service in outage, failure or routine scheduled maintenance requirement for which a warranty claim might be lodged for repair or replacement of failed equipment, spare, component or system. Information shall be exchanged between the BUYER, personnel responsible for drawing inventory from the Spares Depot as may be needed to service a warranty claim as approved by the warranty review technician for DataPath located in the SMC. Warranty claims shall not be allowed where BUYER has not followed the instructions and applicable procedures, maintenance, where the affected part or system has been misused, subject of neglect, subject of sabotage, vandalism, or like abuse. Only authorized part, spare and repair procedures may be used in servicing a warranty claim under this Agreement and any such work shall be in accordance with DataPath Technical Specification hereunder and the recommendations of the manufacturer if different from DataPath.

24

GENERAL DYNAMICS

## EXHIBIT B

**Flow-Down Clauses.**

The following Federal Acquisition Regulation (FAR) and Department of Defense FAR Supplement (DFARS) clauses are incorporated herein by reference. The date of the FAR/DFARS clauses in effect as of the date of the Prime Contract executed shall apply unless otherwise specified. In all FAR/DFARS clauses below, the term "Seller" shall mean "Contractor" and to the term "Contract" shall mean this Agreement and the term "Government", "Contracting Officer" and equivalent phrases as used in the FAR/DFARS clauses below mean Buyer and Buyer's Authorized Procurement Representative, respectively. It is intended that the referenced clauses shall apply to Seller in such manner as is necessary to reflect the position of Seller as a Seller to Buyer, to cause Seller's obligation to Buyer and to the United States Government, and to enable Buyer to meet its obligations under its Prime Contract or subcontract. The extent and scope of applicability to this contract shall be in accordance with Prime Contract or subcontract. The extent and scope of applicability to this contract shall be in accordance with the terms, requirements, guidelines, and limitations stated herein.

If the Government Contracting is other than the Department of Defense, the applicable clause(s) of such Contracting agency that supplement the FAR clauses cited below are hereby incorporated by reference, and the DFARS clauses cited below are hereby deemed deleted.

If the Government Contracting agency is other than the Department of Defense, the applicable elements of such Contracting agency that supplement the FAR clauses cited below are hereby incorporated by reference, and the DFARS clauses cited below are hereby deemed deleted. DFARS 227.7202, entitled Commercial Computer Software and Commercial Computer Software Documentation, shall govern the acquisition of Commercial Computer Software.

Exceptions to the clauses below are noted as follows:

Note 1 - This clause applies only if the Seller is supplying an item, which is an end product under the Buyer's prime Contract.
Note 2 - "Contracting Officer" means only "U.S. Government Contracting Officer".
Note 3 - "Government" means only "U.S. Government".

**FAR Clauses**

FAR Clauses Applicable to This Order Irrespective of the Amount of the Contract (Exceptions as noted).

| | |
|---|---|
| 52.202-1 | Definitions |
| 52.211-15 | Material Requirements |
| 52.211-15 | Defense Priority and Allocation Requirements |
| 52.216-7 | Allowable Cost and Payment |
| 52.222-1 | Notice to the Government of Labor Disputes |
| 52.223-3 | Hazardous Material Identification and Material Safety Data (Alternate I applies only to Non-DoD Contracts) |
| 52.225-7 | Contracts) |
| 52.225-11 | Cross-Depicting Substances |
| 52.226-1 | Buy American Act - Balance of Payments Program-Supplies (Note 1) |
| 52.225-8 | Duty-Free Entry (If contained in the Buyer's contract) |
| 52.225-15 | Sanctioned European Union Country End Products (Note 1) |
| 52.226-1 | Utilization of Indian Organizations and Indian-Owned Economic Enterprises |
| 52.227-3 | Patent Indemnity |
| 52.227-10 | Filing of Patent Applications - Classified Subject Matter |
| 52.227-11 | Patent Rights - Retention by the Seller (Short Form) |
| 52.227-12 | Patent Rights - Retention by the Seller (Long Form) (Note 3) |
| 52.226-5 | Insurance - Work on a Government Installation |
| 52.226-7 | Insurance - Liability to Third Persons |
| 52.232-20 | Limitation of Cost |
| 52.232-22 | Limitation of Funds |
| 52.233-3 | Protest After Award |

FAR/FAR Provisions (2001 08 20)

**GENERAL DYNAMICS**

| | |
|---|---|
| 52.242-15 | Stop-Work Order (Paragraph (b)(2)-change 90 days to 20 days), with Alternate I |
| 52.244-6 | Subcontracts For Commercial Items and Commercial Components |
| 52.245-3 | Government Property |
| 52.246-3 | Inspection of Supplies – Cost-Reimbursement |
| 52.246-5 | Inspection of Services – Cost Reimbursement |
| 52.249-14 | Excusable Delays |

**FAR Clauses Applicable If This Order Exceeds $2,500.** |
| 52.222-13 | Restriction on Certain Foreign Purchase |

**FAR Clauses Applicable If This Order Exceeds $10,000.** |
| 52.222-20 | Walsh-Healey Public Contracts Act |
| 52.222-21 | Prohibition of Segregated Facilities |
| 52.222-26 | Equal Opportunity |
| 52.222-35 | Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era and Other Eligible Veterans |
| 52.222-36 | Affirmative Action for Workers with Disabilities |
| 52.222-37 | Employment Reports on Disabled Veterans and Veterans of the Vietnam Era |

**FAR Clauses Applicable If This Order Exceeds $25,000.** |
| 52.225-3 | Buy America Act – North American Free Trade Agreement- Israeli Trade Act |
| 52.225-13 | Restriction on Certain Foreign Purchase |

**FAR Clauses Applicable If This Order Exceeds $100,000 (Except lines as noted).** |
| 52.203-6 | Restrictions on Subcontractor Sales to the Government |
| 52.203-7 | Anti-Kickback Procedures |
| 52.203-8 | Cancellation, Rescission and Recovery of Funds for Illegal or Improper Activity |
| 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity |
| 52.203-11 | Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions |
| 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions |
| 52.204-2 | Security Requirements |
| 52.215-2 | Audit and Records – Negotiation (Note 2) |
| 52.215-14 | Integrity of Unit Prices |
| 52.219-8 | Utilization of Small Business Concerns |
| 52.223-6 | Drug Free Workplace |
| 52.223-14 | Toxic Chemical Release Reporting |
| 52.227-1 | Authorization and Consent |
| 52.227-2 | Notice and Assistance Regarding Patent and Copyright Infringement |
| 52.232-17 | Interest |
| 52.242-13 | Bankruptcy |
| 52.244-5 | Competition in Subcontracting |
| 52.246-23 | Limitation of Liability ("Acceptance of supplies delivered under this Contract" shall mean acceptance by the Government under this prior Contract of the supplies delivered hereunder or as incorporated in supplies delivered to Buyer.) |
| 52.246-25 | Limitation of Liability – Services |
| 52.247-63 | Preference for U.S.-Flag Air Carriers |
| 52.247-64 | Preference for Privately Owned U.S.-Flag Commercial Vessels |
| 52.248-1 | Value Engineering |

**FAR Clauses Applicable If This Order Exceeds $500,000.** |
| 52.219-9 | Small Business Subcontracting Plan |

GENERAL DYNAMICS

**FAR Clauses Applicable If This Order Exceeds $550,000.**

52.215-10 Price Reduction for Defective Cost or Pricing Data
52.215-11 Price Reduction for Defective Cost or Pricing Data – Modifications
52.215-12 Subcontractor Cost or Pricing Data
52.215-13 Subcontractor Cost or Pricing Data – Modifications
52.215-15 Pension Adjustments and Asset Reversions
52.215-18 Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other Than Pensions
52.215-19 Notification of Ownership Changes
52.215-20 Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data
52.215-21 Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data – Modifications

**DFARS Clauses**

**DFARS Clauses Applicable to This Order Irrespective of the Amount of the Order (Exceptions as noted).**

252.204-7000 Disclosure of Information (In paragraph (b), change "45" days to "60")
252.223-7001 Hazard Warning Labels
252.223-7006 Prohibition on Storage and Disposal of Toxic and Hazardous Materials
252.225-7001 Buy American Act and Balance Of Payments Program
252.225-7002 Qualifying Country Sources as Subcontractors
252.225-7009 Duty-Free Entry–Qualifying Country Supplies
252.225-7010 Duty-Free Entry–Additional Provisions
252.225-7014 Preference for Domestic Specialty Metals – Alternate I
252.225-7016 Restriction on Acquisition of Ball and Roller Bearings
252.225-7036 Buy American Act – Free Trade Agreement – Balance of Payments Program
252.225-7037 Duty-Free Entry – Eligible End Products
252.227-7013 Rights in Technical Data–Noncommercial Items (Note 3)
252.227-7014 Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation (Note 3)
252.227-7016 Rights in Bid or Proposal Information
252.227-7017 Identification and Assertion of Use, Release, or Disclosure Restrictions
252.227-7019 Validation of Asserted Restrictions – Computer Software
252.227-7025 Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends
252.227-7027 Deferred Ordering of Technical Data or Computer Software (Note 3)
252.227-7030 Technical Data–Withholding of Payment (Note 3)
252.227-7034 Patents – Subcontracts (Applicable to Small Businesses only)
252.227-7037 Validation of Restrictive Markings on Technical Data (Note 3)
252.227-7039 Patents–Reporting of Subject Inventions (Applicable to Small Businesses only)
252.231-7000 Supplemental Cost Principles
252.235-7003 Frequency Authorization
252.239-7016 Telecommunications Security Equipment, Devices, Techniques, and Services
252.243-7001 Pricing of Contract Modifications
252.245-7001 Reports of Government Property (In paragraph (e)(3) change Oct. 31 to Sept. 30)

**DFARS Clauses Applicable If This Order Exceeds $100,000.**

252.203-7001 Prohibition on Persons Convicted of Fraud or Other Defense–Contract-Related Felonies
252.208-7000 Intent to Furnish Precious Metals as Government-Furnished Material
252.209-7000 Acquisition from Sellers Subject to On-Site Inspection Under the Intermediate-Range Nuclear Forces (INF) Treaty
252.225-7015 Restriction on Acquisition of Forgings
252.226-7001 Utilization of Indian Organizations and Indian-Owned Economic Enterprises – DOD Contracts

28

**GENERAL PROVISIONS**
(Continued)

252.247-7023   Transportation of Supplies by Sea
252.247-7024   Notification of Transportation of Supplies by Sea
252.249-7002   Notification of Proposed Program Termination or Reduction

**DFARS Clause Applicable If This Order Exceeds $550,000.**
252.219-7003   Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan
252.225-7026   Reporting of Contract Performance Outside the United States

**DFARS Clause Applicable If This Order Exceeds $550,000.**
252.215-7000   Pricing Adjustments

**DFARS Clause Applicable If This Order Exceeds $1,000,000.**
252.211-7000   Acquisition Streamlining
Waiver of United Kingdom Levies

In addition, acknowledgment/grant of purchase orders/subcontracts issued as the result of a United States Government prime contract or subcontract shall be in accord with the provisions of the Defense Priorities and Allocations Systems Regulation (15 CFR Part 350) governing rated orders.

Jun 02 07 10:45a        Bill & Susan Clark                        678-947-6327                        p.1

# GENERAL DYNAMICS
C4 Systems

In reply, refer to:
W002 (CA12922)

01 June 2007

VIA E-Mail

DataPath, Inc.
2450 Satellite Boulevard
Duluth, GA 30096-5801

Attention:     Mr. Kevin McCann
               Sr. Contract Administrator

Subject:       Letter Subcontract No. SATCOM-2007-01-11 Rev. D

Reference:     (a)     SATCOM Prime Contract No. W15P7T-06-D-L219, Delivery Order 0002
               (b)     SATCOM Letter CA12905 Dated 29 MAR 2007

Dear Mr. McCann,

General Dynamics SATCOM Technologies, Inc. (SATCOM) amends the subject Letter Subcontract based solely upon the referenced (a) delivery order to (I) exercise an option of an additional qty. 15 STTs and 10 spares kits, (II) include additional optional quantities, and (III) detail the respective terms and conditions.

The supplies and services covered by the previous Letter Subcontract No. SATCOM-2007-01-11 Rev. C are described below:

    Qty. 10 – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and
    Control System, and O&M Manuals.  $402,161.00 each

    Qty. 10 – CX11230 Triax Connector Interface.  $2,650.60 each

    Qty. 10 – JNN Lot 9 STT complete Spares Kits.  $146,285.00 each

The supplies and services covered by this Letter Subcontract No. SATCOM-2007-01-11 Rev. D are described below:

    Qty. 15 – JNN Lot 9 STT, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and
    Control System, CX11230 Triax Connector Interface, and O&M Manuals.  $374,811.60 each
    ($372,161.00 plus $2,650.60 for the CX11230 modification)

    Qty. 10 – JNN Lot 9 STT complete Spares Kits.  $143,285.00 each

4825 River Green Parkway
Duluth, GA 30096
Tel:  770 497 8800
Fax: 770 476 7062
www.gdsatcom.com

29

01 JUN 2007
Page 2

NOTE: In order to cover this retroactive discount for the initial qty. 10 trailer and spares units ordered under Letter Subcontract No. SATCOM-2007-01-11 Rev. C, an additional $7,500.00 credit shall be applied to each of the next qty. 40 SITs and $1,260.00 credit shall be applied to each of the next qty. 40 Spares kits. Thus, the resulting unit price for the qty. 15 SITs under Rev. D above is $397,311.00 ($374,811.00 less $7,500.00) and 10 Spares under Rev. D above is $142,035 ($143,295.00 less $1,260.00).

OPTIONS for the reduced (4) delivery order:

OPTION FOR INCREASED QUANTITIES: The Contractor may increase the quantity of supplies called for in the schedule below at the unit price specified. The Contractor may exercise the Base Option by written notice to the Subcontractor within the effective date of this Subcontract through 20 December 2007. The Contractor may exercise Option Year 2 by written notice to the Subcontractor within 21 December 2007 through 20 December 2008. The Contractor may exercise Option Year 3 by written notice to the Subcontractor within 21 December 2008 through 20 December 2009. The Contractor may exercise Option Year 4 by written notice to the Subcontractor within 21 December 2009 through 20 December 2010. Delivery of the added items shall continue at the same rate as the like items called for under the Subcontract, unless the Parties otherwise agree.

BASE OPTION YEAR:

Qty. 1-10: JNN Lot 9 SIT, CX-11220 Tdax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals. Firm Fixed Price of $374,811.60 each.

Qty. 1-10: JNN Lot 9 SIT complete Spares Kit. Firm Fixed Price of $143,295.00 each.

Qty. 11-21: JNN Lot 9 SIT, CX-11220 Tdax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals. Firm Fixed Price of $374,811.60 each

Qty. 11-21: JNN Lot 9 SIT complete Spares Kit. Firm Fixed Price of $143,295.00 each

OPTION YEAR 2:

Qty. 1-10: JNN Lot 9 SIT, CX-11220 Tdax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals. Firm Fixed Price of $374,811.60 each

Qty. 1-10: JNN Lot 9 SIT complete Spares Kit. Firm Fixed Price of $143,295.00 each

Qty. 11-21: JNN Lot 9 SIT, CX-11220 Tdax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals. Firm Fixed Price of $374,811.60 each

01 JUN 2007
Page 3

        Qty. 11-21:  JNN Lot 9 STT complete Spares Kit.  Firm Fixed Price of $143,285.00 each

OPTION YEAR 3:

        Qty. 1-10:  JNN Lot 9 STT, CX-11230 Triax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals.  Firm Fixed Price of $374,811.50 each.

        Qty. 1-10:  JNN Lot 9 STT complete Spares Kit.  Firm Fixed Price of $143,285.00 each

        Qty. 11-21:  JNN Lot 9 STT, CX-11230 Triax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals.  Firm Fixed Price of $374,811.50 each

        Qty. 11-21:  JNN Lot 9 STT complete Spares Kit.  Firm Fixed Price of $143,285.00 each

OPTION YEAR 4:

        Qty. 1-10:  JNN Lot 9 STT, CX-11230 Triax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals.  Firm Fixed Price of $374,811.50 each.

        Qty. 1-10:  JNN Lot 9 STT complete Spares Kit.  Firm Fixed Price of $143,285.00 each

        Qty. 11-21:  JNN Lot 9 STT, CX-11230 Triax Connector Interface, with upgraded Miteq BUC for 13.75 – 14.50 GHz, Lot 9 Monitor and Control System including Monitor and Control License, and O&M Manuals.  Firm Fixed Price of $374,811.50 each

        Qty. 11-21:  JNN Lot 9 STT complete Spares Kit.  Firm Fixed Price of $143,285.00 each

Conditions upon which the above credit and option pricing are based:

- DataPath shall be the exclusive provider of the STT under Contract No. W15P7T-06-D-L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"].

- SATCON shall not promote its version of the STT under Contract No. W15P7T-06-D-L219, Delivery Order 0002 ["Support Wide Area Network (SWAN)"].

- DataPath shall deliver the qty. 15 STTs and 10 Spares Kits per the following schedule:

        Qty. 2 STTs/Qty 2 Spares Kits – deliver 30 JUN 2007
        Qty. 6 STTs/Qty 6 Spares Kits – deliver 30 AUG 2007
        Qty. 7 STTs/Qty 2 Spares Kits – deliver 30 OCT 2007

        NOTE:  DataPath is allowed to deliver the current additional qty. 15 STTs before 30 JUN 2007.

01 JUN 2007
Page 4

- DataPath shall pay to SATCOM a Kipper Facility an additional $25,000.00 per antenna enterprise (not including the qty. 10 antenna subsystems for the total qty. 10 STTs under the Letter Subcontract) for future orders directly related to SWAN. The additional per antenna amount will directly correlate to the quantity exercised by SATCOM (example: qty. 15 STTs exercised in this delivery order, therefore $75,000 additional payment from DataPath to SATCOM will be made for these antenna purchases). If for some reason DataPath purchases a lesser quantity of antenna subsystems to fulfil an order, then the $5,000 payment per antenna subsystem will still be applied to the quantity exercised by SATCOM and not the quantity purchased by DataPath.

- DataPath shall be the exclusive provider of Field Service Representatives (FSRs) for Contract No. W91RTT-06-D-1219, Delivery Order 0022 [Support Wide Area Network (SWAN)] (Iraq and Horn of Africa cont'd., provided the FSR options are exercised by the Government and DataPath meets or exceeds the target prices of $232,000 for Horn of Africa and $282,000 for Iraq.

- DataPath shall not charge any storage fees and the like in the event any units are shipped" . . . . . is place.

**Additional terms and conditions:**

- Terms and conditions of this Letter Subcontract take precedence over the terms and conditions on the reverse side of any purchase order issued by SATCOM under the SWAN program.

- DataPath's standard 1-year warranty and warranty service shall apply (reference e-mail to B. Clark from D. Hall at 3:05PM on 27 APR 2007).

- DataPath asserts limited rights for technical data delivered and to be delivered under the SWAN program (reference e-mail to B. Clark from D. Hall at 11:56AM on 04 MAY 2007).

- The FAR/DFAR flow downs, except as modified by this Letter Subcontract, shall apply (reference e-mail to D. Hall from B. Clark at 6:15PM on 03 MAY 2007).

SATCOM authorizes DataPath to ship (Ex Works INCOTERMS 2000) each ordered item above to:

General Dynamics SATCOM Technologies
4826 River Green Parkway
Duluth, Georgia 30096

DataPath shall send invoices to:

JUN 01 07 10:58     Bill & Susan Clark                                           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/     p.5

01 JUN 2007
Page 5

General Dynamics SATCOM Technologies
Attn: Accounts Payable
4525 River Green Parkway
Duluth, Georgia 30096

After Inspection and Acceptance by SATCOM at either (i) DataPath's facility for any shipped-in-place units or (ii) SATCOM's Duluth Facility, SATCOM shall pay the Invoice not 30 from the date of Invoice.  Payment shall be made via check.

Letter Subcontract No. SATCOM-2007-01-01 Rev. D authorizes DataPath to make additional expenditures of $6,530,024.00 for the qty. 15 STTs and 10 Spares into detailed above.  In total, Datapath is not authorized to make expenditures or incur obligations hereunder that exceed $12,400,990.00.  A firm fixed price type definitive purchase order no. 2008995 is contemplated to incorporate this Letter Subcontract. This Letter Subcontract is a DO-A7 rated order under DPAS.

Please provide your written confirmation and acceptance of this amended Letter Subcontract by close of business Friday, 01 JUN 2007.  Please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

General Dynamics
SATCOM Technologies

William K. Clark, Jr.
Director of Contracts
Programs, Duluth Facility

cc:   M. Shoemate
      C. Buck
      R. Fioccardi
      M. Ghanapani
      R. Mansfield

33

<u>VERIFICATION</u>

STATE OF GEORGIA    §
                    §
COUNTY OF GWINNETT  §

      PERSONALLY APPEARED before me, an officer duly authorized by law to administer oaths, David J. Hall, who after first being duly sworn, states:

      The allegations set forth in the foregoing First Amended Verified Complaint and Application for Injunctive Relief for and on behalf of DataPath, Inc. are true and correct according to the records, files, and information available to DataPath, Inc.

_____
David J. Hall

Sworn to and subscribed before me
this _14_ day of September, 2007.

_____
NOTARY PUBLIC

My Commission Expires: _____

BECKY L. CLARK
Notary Public, Gwinnett Co., GA
My Commission Expires July 14, 2010

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties with the within and foregoing First Amended Verified Complaint, by depositing a true and correct copy thereof in the United States Mail, postage prepaid, properly addressed as follows:

Kenneth B. Weckstein, Esquire
Epstein Becker & Green, P.C.
1227 – 25th Street, N.W., Suite 700
Washington, D.C.  20037-1156
*Attorney for Defendant General Dynamics SATCOM Technologies, Inc.*

This 14th day of September, 2007.

Reginald M. Jones
Georgia Bar No. 405047
*Attorney for Plaintiff DataPath, Inc.*

252097_1.doc